125 T.C. No. 4

UNITED STATES TAX COURT

XILINX INC. AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

XILINX INC. AND CONSOLIDATED SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4142-01, 702-03.  Filed August 30, 2005.

P entered into a cost-sharing agreement to develop intangibles with S, its foreign subsidiary.  Each party was required to pay a percentage of the total research and development costs based on its respective anticipated benefits from the intangibles.  P issued stock options to its employees performing research and development.  In determining the allocation of costs pursuant to the agreement, P did not include in research and development costs any amount related to the issuance of stock options to, or exercise of stock options by, its employees.  R, in his notices of deficiency, determined that for cost-sharing purposes, pursuant to sec. 1.482-7(d), Income Tax Regs., the spread (i.e., the stock's market price on the exercise date over the exercise price) or, in the alternative, the grant date value, relating to compensatory stock options, should have been included as a research and development cost.

1. <u>Held</u>:  R's allocation is contrary to the arm's-length standard mandated by sec. 1.482-1(b), Income Tax Regs., because uncontrolled parties would not allocate the spread or the grant date value relating to employee stock options.

2. <u>Held</u>, <u>further</u>,  P's allocation satisfies the arm's-length standard mandated by sec. 1.482-1, Income Tax Regs.

<u>Kenneth B. Clark</u>, <u>Ronald B. Schrotenboer</u>, <u>William F. Colgin</u>, <u>Tyler A. Baker</u>, <u>Jaclyn J. Pampel</u>, <u>Anthony D. Cipriano</u>, and <u>Allen Madison</u>, for petitioners.

<u>David P. Fuller</u>, <u>Jeffrey A. Hatfield</u>, <u>Bryce A. Kranzthor</u>, <u>Lloyd T. Silberzweig</u>, <u>Kendall Williams</u>, <u>David N. Bowen</u>, <u>John E. Hinding</u>, and <u>Paul K. Webb</u>, for respondent.


OPINION


FOLEY, <u>Judge</u>:  Respondent determined deficiencies in the amounts of $24,653,660, $25,930,531, $27,857,516, and $27,243,975 and section 6662(a) accuracy-related penalties in the amounts of $4,935,813, $5,189,389, $5,573,412, and $5,448,795 relating to petitioners' 1996,[1] 1997, 1998, and 1999 Federal income taxes, respectively.  The issues for decision are whether:  (1) Petitioner and its foreign subsidiary must share the cost, if any, of stock options petitioner issued to research and development employees, (2) respondent's allocations meet the arm's-length requirement set forth in section 1.482-1(b), Income Tax Regs., and (3) petitioners are liable for section 6662(a) accuracy-related penalties.

---

[1] Pursuant to the parties' Apr. 4, 2002, stipulation of settled issues, the 1996 taxable year is no longer in issue.

## Background

I.   Xilinx's Line of Business and Corporate Structure

Xilinx Inc.,[2] is in the business of researching, developing, manufacturing, marketing, and selling field programmable logic devices,[3] integrated circuit devices, and other development software systems.  Petitioner uses unrelated producers to fabricate and assemble its wafers into integrated circuit devices.

During the years in issue, petitioner was the parent of a group of affiliated subsidiaries including, but not limited to Xilinx Holding One Ltd., Xilinx Holding Two Ltd., Xilinx Development Corporation (XDC), NeoCAD Inc.,[4] Xilinx Ireland (XI), and Xilinx International Corporation.  XI was established in 1994 as an unlimited liability company under the laws of Ireland and was owned by Xilinx Holding One Ltd., and Xilinx Holding Two Ltd. (i.e., Irish subsidiaries of petitioner).  XI was created to manufacture field programmable logic devices and to increase petitioner's European market share.  It manufactured, marketed, and sold field programmable logic devices, primarily to customers

---

[2]  All references to "petitioner" are to Xilinx Inc.  All references to "petitioners" are to Xilinx Inc. and its consolidated subsidiaries.

[3]  Field programmable logic devices are integrated circuits that can be programmed, using development software, to perform complex functions.

[4]  NeoCAD Inc., was liquidated in 1998.

in Europe, and conducted research and development.

II.  The Cost-Sharing Agreement

On April 2, 1995, petitioner and XI entered into a Technology Cost and Risk Sharing Agreement (cost-sharing agreement).  The cost-sharing agreement provided that all "New Technology" developed by either petitioner or XI would be jointly owned.  New Technology was defined as technology developed by petitioner, XI, or petitioner's consolidated subsidiaries, on or after the execution date of the cost-sharing agreement.  Each party was required to pay a percentage of the total research and development costs based on the respective anticipated benefits from New Technology.  The cost-sharing agreement further provided that each year the parties would review and, when appropriate, adjust such percentages to ensure that costs continued to be based on the anticipated benefits to each party.

Petitioner and XI were required to share direct costs, indirect costs, and acquired intellectual property rights costs. Direct costs were defined in the agreement as those costs directly related to the research and development of New Technology including, but not limited to, salaries, bonuses, and other payroll costs and benefits.  Indirect costs were defined as those costs, incurred by other departments, that generally benefit all research and development including, but not limited to, administrative, legal, accounting, and insurance costs.

Acquired intellectual property rights costs were defined as costs incurred in connection with the acquisition of products or intellectual property rights. In determining the allocation of costs pursuant to the cost-sharing agreement, petitioner did not include in research and development costs any amount related to the issuance of employee stock options (ESOs).

Cost-sharing percentages for petitioner and XI relating to 1997, 1998, and 1999 were as follows:

| Year | Petitioner | XI |
|------|-----------|--------|
| 1997 | 73.61% | 26.39% |
| 1998 | 73.35 | 26.65 |
| 1999 | 65.09 | 34.91 |

In 1997, 1998, and 1999, the following number of petitioner's and XI's employees engaged in research and development:

| Year | Petitioner | XI |
|------|-----------|----|
| 1997 | 338 | 6 |
| 1998 | 343 | 10 |
| 1999 | 394 | 16 |

III. Petitioner's Stock Option Plans

ESOs are offers to sell stock at a stated price (i.e., the exercise price) for a stated period of time. They are used by many companies to attract, retain, and motivate employees and align employee and employer goals. There are basically three types of ESOs: statutory or incentive stock options (ISOs), nonstatutory stock options (NSOs), and purchase rights issued pursuant to an employee stock purchase plan (ESPP purchase

rights). ISOs and NSOs allow employees to purchase stock at a

fixed price for a specified period of time. ESPP purchase rights

allow employees to purchase stock at a discount through the use

of payroll deductions. ISOs and ESPP purchase rights receive

special tax treatment and are typically not subject to tax when

they are granted or exercised, but the stock acquired pursuant to

the exercise of these options is subject to tax when such stock

is sold.[5] NSOs, however, are, pursuant to section 83,[6] Property

Transferred in Connection with the Performance of Services,

subject to tax upon exercise unless the option has a readily

ascertainable fair market value.[7] Sec. 83(a). If an NSO has a

_____

[5] Pursuant to secs. 422 and 423, respectively, ISOs and
ESPP purchase rights are subject to a holding period requirement.
This period begins on the exercise date and ends on the date that
is the later of 2 years after the grant date or 1 year after the
transfer of the share of stock. Secs. 422(a)(1) and 423(a)(1).
If the employee disposes of the stock before the holding period
expires, this disposition will be considered a "disqualifying
disposition". A disqualifying disposition requires the employee
to recognize ordinary income (i.e., equal to the stock's market
price on the exercise date over the exercise price) in the
taxable year in which the disposition occurred. Sec. 421(b).

[6] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

[7] An option has a readily ascertainable fair market value
if it is actively traded on an established market or the taxpayer
can establish all of the following conditions: (1) The option is
transferable by the optionee; (2) the option is exercisable
immediately in full by the optionee; (3) the option is not
subject to any restriction which has a significant effect on the
fair market value of the option; and (4) the fair market value of
                                                    (continued...)

readily ascertainable fair market value, income is recognized on
the grant date, and the issuer is entitled to a deduction.  Sec.
83(h); sec. 1.83-7(a), Income Tax Regs.

NSOs, when granted, may be "in-the-money", "out-of-the-
money", or "at-the-money".  ISOs, however, may only be "at-the-
money" or "out-of-the-money".[8]  An option is deemed in-the-money
when the exercise price on the grant date is below the stock's
market price.  Conversely, an option is out-of-the-money when the
exercise price on the grant date is above the stock's market
price.  An option that has an exercise price equal to the stock's
market price on the grant date is considered at-the-money.

An employee typically cannot exercise options, until the
employee has a vested right (i.e., a legal right that is not
contingent on the performance of additional services) in the
option pursuant to the stock option plan's terms.  Some companies
permit immediate vesting upon issuance of an option, while others
delay vesting several years or allow incremental vesting over a
period of years.

---

[7](...continued)
the option privilege is readily ascertainable.  Sec. 1.83-7(b)(1)
and (2), Income Tax Regs.  "Option privilege" is the value of the
right to benefit from any future increase in the value of the
property subject to the option, without risking any capital.
Sec. 1.83-7(b)(3), Income Tax Regs.

[8]  Pursuant to sec. 422, the exercise price relating to ISOs
may not be less than the stock's market price on the grant date.
Sec. 422(b)(4).

Petitioner, pursuant to broad-based plans (i.e., plans that offer ESOs to 20 percent or more of a company's employees), offered three types of stock option compensation:  ISOs, NSOs, and ESPP purchase rights.  All ISOs and NSOs issued by petitioner were at-the-money.  All ESPP purchase rights were issued with an exercise price equal to 85 percent of the stock's market price.  Prior to and during the 1997 taxable year, the options were generally subject to a 5-year vesting period.  After 1997, petitioner decreased the vesting period from 5 to 4 years.

Pursuant to the stock option plan, employees could exercise options by delivering to petitioner's broker a notice of exercise with irrevocable instructions and consideration equal to the exercise price.  The broker would then deliver the instructions and consideration to petitioner.  Employees could elect to exercise their options in either a "same-day-sale" or "buy-and-hold" transaction.  In a same-day-sale, the employee does not make a payment for the stock relating to the option.  Instead, simultaneous execution of the option and sale of the stock results in the excess of the stock's market price on the grant date over the exercise price going to the employee and the amount of the exercise price going to petitioner.  In a buy-and-hold transaction, the employee pays the exercise price by presenting a check or other form of consideration to petitioner's broker and in exchange receives the shares of stock.

-9-

A.    1988 Stock Option Plan

In 1988, petitioner established the Xilinx 1988 Stock Option
Plan (1988 Stock Option Plan).  The 1988 Stock Option Plan
provided for the grant of ISOs and NSOs.  Under the 1988 Stock
Option Plan, petitioner granted options as part of the employee
hiring process and retention program.  Petitioner also granted
merit and discretionary stock options.  Merit options were based
on job performance and granted after an employee's annual review.
Discretionary stock options were a separate pool of options made
available to petitioner's vice presidents to reward their
subordinates for significant project achievements.

Under the 1988 Stock Option Plan, former employees generally
could exercise options if the exercise occurred within 30 days
after the cessation of the employee's tenure at the company.  In
April of 1998, the 1988 Stock Option Plan was replaced by the
Xilinx, Inc. 1997 Stock Plan (1997 Stock Option Plan).  The 1997
Stock Option Plan provided for the grant of ESPP purchase rights
in addition to ISOs and NSOs.

B.    1990 Employee Qualified Stock Purchase Plan

The Xilinx, Inc. 1990 Employee Qualified Stock Purchase Plan
(ESPP) allowed full-time employees to purchase petitioner's stock
at a discount.  Beginning January 1, 1990, the ESPP provided 24-
month offering periods which commenced during the beginning of

January and July. Eligible employees could participate in the ESPP by completing a Subscription Agreement authorizing payroll deductions. During a 24-month offering period, employees could contribute to the plan through payroll deductions in any amount between 2 and 15 percent of their total compensation. Upon exercise, petitioner would deduct the exercise price from the employee's accumulated payroll deductions. The exercise price was equal to the lower of 85 percent of the stock's market price on the offering date (i.e., the first day of each offering period), or 85 percent of the stock's market price on the exercise date. Stock could be purchased twice a year (i.e., on June 30 and December 31).

Petitioner also maintained a stock buy-back program. Pursuant to the program, petitioner, during 1997, 1998, and 1999, purchased stock from stockholders and transferred such stock (i.e., treasury shares) to employees who had exercised options or purchased stock pursuant to petitioner's ESPP.

IV. Petitioner's Stock Option Intercompany Agreements With XI

On March 31, 1996, petitioner and XI entered into The Xilinx Ireland/Xilinx, Inc. Stock Option Intercompany Agreement. The purpose of the Stock Option Intercompany Agreement was to allow XI employees to acquire stock in petitioner. The Stock Option Intercompany Agreement provided that the cost incurred by petitioner for the grant or exercise of options by XI employees

would be borne by XI.  The cost equaled the stock's market price on the exercise date over the exercise price.  Upon receipt of petitioner's notice specifying the appropriate amount, XI was required to pay petitioner.

On March 31, 1996, petitioner and XI also entered into the Xilinx, Inc./Xilinx Ireland Employee Stock Purchase Plan Reimbursement Agreement (ESPP Reimbursement Agreement), which allowed XI employees to purchase, with payroll deductions, petitioner's stock.  XI was required to pay petitioner the cost associated with the exercise of the options.  Pursuant to the agreement, the cost equaled the stock's market price on the exercise date over the exercise price.  Upon receipt of petitioner's notice specifying the appropriate amount, XI was required to pay petitioner.

V.    Financial Accounting Disclosure Rules

A.    Background

The Financial Accounting Standards Board (FASB) is the professional organization primarily responsible for establishing financial reporting standards in the United States.  FASB's standards are known as Generally Accepted Accounting Principles (GAAP).  For more than 30 years, FASB has recognized certain ESOs as an expense to the issuing corporation.

B.    Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25)

In 1972, FASB authorized APB 25, which required ESOs to be valued using the "intrinsic value method" (IVM).  From 1972 to December 15, 1995, the IVM was the only authorized financial accounting method for valuing ESOs.  Under the IVM, the value of ESOs is the excess of the stock's market price on the grant date over the exercise price.  This value is reported directly on the employer's income statement relating to the year in which the ESOs are granted.  ESOs granted at-the-money have no intrinsic value because the stock's market price on the grant date is equal to the exercise price.

C.    Statement of Financial Accounting Standard No. 123, "Accounting for Stock-Based Compensation" (SFAS 123)

In October of 1995, FASB issued SFAS 123, which is effective for fiscal years ending after December 15, 1995.  SFAS 123 added the "fair value method" (FVM) as the preferred method for valuing ESOs.  Pursuant to SFAS 123, companies continuing to use the IVM were required to "make pro forma disclosures of net income and, if presented, earnings per share, as if the * * * [FVM] had been applied."

The value of an ESO is composed of two components:  the intrinsic value and the call premium.  While the intrinsic value is equal to the stock's market price on the grant date over the

exercise price, the call premium is the amount, in excess of an ESO's intrinsic value, that a purchaser would be willing to pay for the ESO. An ESO's call premium is difficult to measure because it, unlike the call premium of a publicly traded option, cannot be valued daily based on market transactions. FASB readily recognized that the IVM fails to measure adequately the call premium relating to ESOs.[9] Nevertheless, the IVM remained a permissible accounting method during the years in issue. Although the FVM was added as the preferred method in 1996, most companies continued to use the IVM during the years in issue.

Pursuant to the FVM, a corporation must measure the amount of the expense as equal to the fair value of the ESO on the grant date and amortize such expense over the vesting period. Under SFAS 123, fair value is measured using option pricing models that consider the following six attributes of equity-based instruments: (1) The exercise price, (2) the expected life of the option, (3) the current price of the underlying stock, (4) the expected price volatility of the underlying stock, (5) expected dividends, and (6) the risk-free interest rate for the expected life of the option.

The FVM utilizes option pricing models, such as the Black

---

[9] FASB, in SFAS 123, stated: "Zero is not within the range of reasonable estimates of the value of employee stock options at the date they are granted, the date they vest, or at other dates before they expire."

Scholes model (BS model), for purposes of measuring the value of ESOs. The BS model was originally designed to measure publicly traded options and, as a result, fails to adequately take into account numerous differences between ESOs and publicly traded options. For example, ESOs are nontransferable and have terms to maturity that are usually longer than those of publicly traded options. The extended term of an ESO complicates the task of estimating the volatility of the stock price, which is an essential input in the pricing of any option. Furthermore, ESOs cannot be traded, so they must be discounted to account for the difference in value between tradeable and nontradeable options (i.e., tradeable options are worth more than nontradeable options). Yet, the appropriate discount is difficult to determine with reasonable accuracy because the discount is based on the value of the ESO to an employee. Moreover, an ESO's value is affected by whether an employee forfeits the option by failing to exercise it or exercises the option prior to the expiration of the ESO's maximum life. These employee decisions cannot be reliably modeled. Thus, FAS 123 requires companies to make certain adjustments to take into account the differences between ESOs and publicly traded options. For example, to account for option forfeiture, SFAS 123 requires that an ESO's value be discounted to reflect the amount of forfeitures expected annually. With respect to early exercise, the expected life of

the option is used instead of the ESO's actual or maximum life.

During the years in issue, petitioners, on their Securities and Exchange Commission Forms 10-K, elected to use the IVM, as prescribed in APB 25, to measure expenses attributable to ESOs. As required by SFAS 123, petitioners disclosed net income and earnings per share as if the FVM had been applied. In determining the fair value of ESOs, petitioners used an adjusted BS model.

## VI. Procedural History

### A. Petitioners' Federal Income Tax Returns

Petitioners are accrual basis taxpayers and timely filed consolidated Federal income tax returns for their taxable years ended March 29, 1996, March 29, 1997, March 28, 1998, and April 3, 1999. During the years in issue, GAAP, pursuant to APB 25, provided that the issuing company did not incur an expense related to options granted at-the-money. In accordance with APB 25, petitioner did not, for purposes of its cost-sharing agreement with XI, include any costs related to ESOs issued to employees.

On December 28, 2000, and October 17, 2002, respondent issued notices of deficiency relating to 1996 through 1998 and 1999, respectively. In his notices of deficiency, respondent determined that petitioners were required, pursuant to its cost-

sharing agreement, to share with XI the costs of certain ESOs.

Respondent determined that the cost required to be taken into

account equaled the spread (i.e., the stock's market price on the

exercise date over the exercise price) relating to ESOs exercised

by petitioner's employees (spread theory).  Respondent defined

the spread as the amount of petitioners' section 83 deduction

relating to the exercise of NSOs and disqualifying dispositions

of ISOs and ESPP purchase rights.[10]  Respondent's determination

resulted in the following deficiencies and penalties:[11]

|  |  | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1996 | $24,653,660 | $4,935,813 |
| 1997 | 25,930,531 | 5,189,389 |
| 1998 | 27,857,516 | 5,573,412 |
| 1999 | 27,243,975 | 5,448,795 |

On March 26, 2001, and January 14, 2003, respectively,

petitioners timely filed their petitions with the Court seeking a

redetermination of the deficiencies set forth in the December 28,

2000, and October 17, 2002, notices.  Petitioner's principal

place of business was San Jose, California, at the time the

---

[10]  ISOs and ESPP purchase rights meeting the requirements of secs. 422 and 423, however, were not included in respondent's definition because they are not subject to tax under sec. 83 (see supra note 5).

[11]  Respondent's reallocation of petitioner's expenses, in turn, reduced petitioner's deductible business expenses and increased petitioner's taxable income.

petitions were filed.  On April 4, 2002, the parties stipulated that no amount relating to ESOs would be included in petitioner's 1996 cost-sharing pool.

B.    Summary Judgment Motions

The Court filed petitioners' motion for partial summary judgment on February 4, 2002, and on March 6, 2002, filed respondent's cross-motion for partial summary judgment.  On October 28, 2003, we denied both parties' motions, addressed whether the spread is a cost pursuant to section 1.482-7(d)(1), Income Tax Regs., and concluded:

> respondent has not established that the spread is
> indeed a cost or that the exercise date is the
> appropriate time to determine and measure such cost.
> * * *  In addition, * * * petitioner has not
> sufficiently established that it did not incur an
> expense upon the employee's exercise of the options at
> issue.

The Court also addressed whether respondent's lack of knowledge of comparable transactions (i.e., where unrelated parties agree to share the spread), or a finding that uncontrolled parties would not share the spread, would have any effect on respondent's authority to make allocations pursuant to section 1.482-1(a)(2), Income Tax Regs.  We concluded:

> Section 1.482-1(b)(2), Income Tax Regs., does not
> require respondent to have actual knowledge of an
> arm's-length transaction as a prerequisite to
> determining that an allocation should be made.  See
> Seagate Technology, Inc. v. Commissioner, T.C. Memo.
> 2000-388.  If, however, it is established that

uncontrolled parties would not share the spread, we may conclude that respondent's determination is arbitrary, capricious, or unreasonable. * * * neither party has presented sufficient evidence or established facts adequately addressing whether the arm's-length standard has been met.

C. Promulgation of Regulations Addressing Cost Sharing of Stock-Based Compensation

On July 29, 2002, the U.S. Department of the Treasury (Treasury) issued proposed regulations regarding the treatment of ESOs for cost-sharing purposes. In the preamble accompanying these proposed regulations, Treasury stated:

> The proposed regulations provide that in determining a controlled participant's operating expenses within the meaning of § 1.482-7(d)(1), all compensation, including stock-based compensation, * * * must be taken into account.

67 Fed. Reg. 48999 (July 29, 2002). As a result of this change (i.e., the inclusion of stock-based compensation) to section 1.482-7(d)(1), Income Tax Regs., Treasury stated that it was adding:

> express provisions coordinating the cost sharing rules of § 1.482-7 with the arm's length standard as set forth in § 1.482-1. New § 1.482-7(a)(3) clarifies that in order for a qualified cost sharing arrangement to produce results consistent with an arm's length result within the meaning of § 1.482-1(b)(1), all requirements of § 1.482-7 must be met, including the requirement that each controlled participant's share of intangible development costs equal its share of reasonably anticipated benefits attributable to the development of intangibles. The proposed regulations also make amendments to § 1.482-1 to clarify that § 1.482-7 provides the specific method to be used to evaluate whether a qualified cost sharing arrangement produces

results consistent with an arm's length result, and to clarify that under the best method rule, the provisions of § 1.482-7 set forth the applicable method with respect to qualified cost sharing arrangements.

Id. at 49000.  Sections 1.482-1 and 1.482-7, Income Tax Regs., were modified as follows:

> SEC. 1.482-1. Allocation of Income and Deductions Among Taxpayers.
>
>   *  *  *  *  *  *  *
>
> (2) * * * Section 1.482-7 provides the specific method to be used to evaluate whether a qualified cost sharing arrangement produces results consistent with an arm's length result.
>
>   *  *  *  *  *  *  *
>
> SEC. 1.482-7. Sharing of Costs.
>
>   *  *  *  *  *  *  *
>
> (3) Coordination with § 1.482-1.--A qualified cost sharing arrangement produces results that are consistent with an arm's length result within the meaning of § 1.482-1(b)(1) if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development (as required by paragraph (a)(2) of this section) and all other requirements of this section are satisfied.
>
>   *  *  *  *  *  *  *
>
> (2) Stock-based compensation.--(i)* * * a controlled participant's operating expenses include all costs attributable to compensation, including stock-based compensation.  * * * stock-based compensation means any compensation provided by a controlled participant to an employee * * * in the form of equity instruments, options to acquire stock (stock options), or rights with respect to (or determined by reference to) equity instruments or stock options, including but not limited to property to which section 83 applies and stock options to which section 421 applies, regardless of whether ultimately settled in the form of cash, stock, or other property.

(ii) * * * all stock-based compensation that is granted during the term of the qualified cost sharing arrangement and is related at date of grant to the development of intangibles * * * is included as an intangible development cost * * *.

(iii) <u>Measurement and timing of stock-based compensation expense</u>.--(A) <u>In general</u>.-Except as otherwise provided in this paragraph (d)(2)(iii), the operating expense attributable to stock-based compensation is equal to the amount allowable to the controlled participant as a deduction for federal income tax purposes with respect to that stock-based compensation (for example, under section 83(h)) and is taken into account as an operating expense under this section for the taxable year for which the deduction is allowable.

(1) <u>Transfers to which section 421 applies</u>.--Solely for purposes of this paragraph (d)(2)(iii)(A), section 421 does not apply to the transfer of stock pursuant to the exercise of an option that meets the requirements of section 422(a) or 423(a).

<u>Id.</u> at 49001.  On August 26, 2003, Treasury finalized its proposed regulations without modifying the above-referenced provisions.  The final regulations are applicable to stock-based compensation provided to employees in taxable years beginning on or after August 26, 2003.

D.   <u>Respondent's Amendments to Answer</u>

In the December 28, 2000, notice of deficiency, respondent determined that the cost-sharing pool included ESOs granted to petitioner's research and development employees prior to and after April 2, 1995 (i.e., the cost-sharing agreement's execution date), and exercised during 1997 and 1998.  On August 4, 2003, the Court filed respondent's motion for leave to file an

amendment to the answer in docket No. 4142-01 (i.e., relating to 1997 and 1998). On October 21, 2003, the Court granted the motion and filed respondent's amendment to answer which asserted that the only ESOs at issue were those granted on or after April 2, 1995, and exercised during 1997 and 1998. As a result of this amendment, respondent's adjustments to petitioner's cost-sharing pool, relating to ESOs exercised in 1997 and 1998, decreased from $4,504,781 to $389,037 and $5,195,104 to $1,263,006, respectively.

On November 25, 2003, the Court granted the parties' joint motion to consolidate docket No. 4142-01 and docket No. 702-03 (i.e., relating to 1999) for purposes of trial, briefing, and opinion.

The Court, on February 6, 2004, filed respondent's motion for leave to file a second amendment to the answer in docket No. 4142-01 and an amendment to the amended answer in docket No. 702-03. In this motion, respondent sought permission to contend that ESOs provided to petitioner's research and development employees be valued as of the date those options were granted (grant date theory). On April 8, 2004, the Court denied respondent's motion because the motion failed to provide sufficient information (i.e., the number of options at issue or the amounts of the revised deficiencies) relating to respondent's grant date theory.

The Court, on May 11, 2004, filed respondent's motion for

leave to file a second amendment to the answer in docket No. 4142-01 and an amendment to the amended answer in docket No. 702-03. In this motion, respondent included the number of options at issue and the amounts of the revised deficiencies. Pursuant to his grant date theory, the amounts of the revised deficiencies relating to 1997, 1998, and 1999 are $25,121,951, $27,854,698, and $24,784,465, respectively. On June 3, 2004, the Court granted respondent's motion but concluded that respondent's amendment raised a new matter because "the grant date theory requires different evidence (i.e., includes additional options and utilizes a different method of valuation)" and alters the original deficiency. On July 14, 2004, the trial commenced.

## Discussion

I. Applicable Statute and Regulations

   A. Purpose and Scope of Section 482

Section 482 was enacted to prevent tax evasion and ensure that taxpayers clearly reflect income relating to transactions between controlled entities. It accomplishes this purpose by authorizing respondent:

> [to] distribute, apportion, or allocate gross income,
> deductions, credits, or allowances between or among
> * * * [controlled entities], if he determines that such
> distribution, apportionment, or allocation is necessary
> * * * to prevent evasion of taxes or clearly to reflect
> the income of * * * [such entities].

Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. Sec. 1.482-1(a)(1), Income Tax Regs. In determining true taxable income, "the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." See <u>United States Steel Corp. v. Commissioner</u>, 617 F.2d 942, 947 (2d Cir. 1980) (stating the "'arm's length' standard is * * * meant to be an objective standard that does not depend on the absence or presence of any intent on the part of the taxpayer to distort his income."), revg. T.C. Memo. 1977-140; sec. 1.482-1(b)(1), Income Tax Regs. Because identical transactions are rare, the arm's-length result will "generally * * * be determined by reference to the results of comparable transactions under comparable circumstances." Sec. 1.482-1(b)(1), Income Tax Regs.

    B.   <u>Application of Section 482 to Qualified Cost-Sharing Agreements</u>

Section 482 provides that "In the case of any transfer * * * of intangible property * * * the income with respect to such transfer * * * shall be commensurate with the income attributable to the intangible." Participants in a qualified cost-sharing agreement (QCSA) relinquish exclusive ownership of all exploitation rights in new intangibles they individually develop and agree to share ownership of, and costs associated with, such

intangibles.  For purposes of section 482, this relinquishment constitutes a transfer of specified future exploitation rights. See sec. 1.482-7(a)(3), (g), Income Tax Regs.

Section 1.482-7(a)(1), Income Tax Regs., requires participants "to share the costs of development of one or more intangibles in proportion to their * * * [respective] shares of reasonably anticipated benefits."  Anticipated benefits are defined as "additional income generated or costs saved by the use of covered intangibles".  Sec. 1.482-7(e)(1), Income Tax Regs. If parties fail to share such costs in proportion with their benefits, respondent is authorized to make allocations "to the extent necessary to make each controlled participant's share of the costs * * * equal to its share of reasonably anticipated benefits".  Sec. 1.482-7(a)(2), Income Tax Regs.

## II.   Are the Spread and Grant Date Value Costs for Purposes of Section 1.482-7, Income Tax Regs.?

Intangible development costs are defined as "all of the costs incurred * * * related to the intangible development area * * * [which] consist of the following items:  operating expenses as defined in * * * [section] 1.482-5(d)(3), other than depreciation or amortization expense".  Sec. 1.482-7(d)(1), Income Tax Regs.  Operating expenses are defined as "all expenses not included in cost of goods sold except for interest expense, foreign income taxes * * *, domestic income taxes, and any other

expenses not related to the operation of the relevant business activity." Sec. 1.482-5(d)(3), Income Tax Regs.

Respondent contends that petitioner paid its employees ESOs in exchange for research and development services, and such services contributed to petitioner's development of intangibles. In support of his position, respondent emphasizes petitioners' tax treatment of options for section 41, Credit For Increasing Research Activities, and section 83 purposes.

Petitioners contend that there was no outlay of cash upon the issuance of its ESOs, and thus, no cost was incurred. Petitioners further contend that any cost associated with the ESOs was borne by shareholders because the exercise of ESOs increased the outstanding shares and reduced existing shareholders' earnings per share. In addition, petitioners contend that the costs determined by respondent are not related to petitioner's intangible development area. Assuming arguendo that the spread and the grant date value are costs for purposes of section 1.482-7(d), Income Tax Regs., we conclude that respondent's allocations fail to meet the requirements of section 1.482-1(b), Income Tax Regs. (discussed infra section III.D).

III. Respondent's Allocations Are Inconsistent With the Arm's-Length Standard Mandated by Section 1.482-1, Income Tax Regs.

    A.    Respondent's Authority To Make Allocations

Section 482 provides respondent with wide latitude in allocating income and deductions between controlled parties to ensure such parties report their true taxable income. This broad grant of authority, however, is constrained by section 1.482-1, Income Tax Regs., which sets forth the "general principles and guidelines to be followed under section 482." Sec. 1.482-1(a)(1), Income Tax Regs. The sections to which these general principles and guidelines apply include, but are not limited to, section 1.482-7, Income Tax Regs. Id.

Section 1.482-1(a)(2), Income Tax Regs., authorizes respondent to "make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income." In determining true taxable income, "the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer" (i.e., arm's-length standard). Sec. 1.482-1(b)(1), Income Tax Regs. (emphasis added). The arm's-length standard is employed to ensure that related party transactions clearly reflect the income of each party and to prevent tax evasion.

B.    Respondent's Interpretation of Sections 1.482-1 and
      1.482-7, Income Tax Regs., Is Incorrect

Neither party disputes the absence of comparable transactions in which unrelated parties agree to share the spread or the grant date value.  Nor do the parties dispute the fact that unrelated parties would not "explicitly" (i.e., within the written terms of their agreements) share the spread or the grant date value.  The parties, however, disagree about what effect these facts have on respondent's authority to make allocations pursuant to section 1.482-1, Income Tax Regs.

Pursuant to section 1.482-1(b)(1), Income Tax Regs., "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances".  Section 1.482-1(b)(1), Income Tax Regs., further states:

> because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances.  [Emphasis added.]

Respondent presented no evidence or testimony establishing that his determinations are arm's length.  He simply contends that the "application of the express terms of Treas. Reg. § 1.482-7 itself produces an arm's-length result," and that "it is unnecessary to perform any type of comparability analysis to

determine * * * whether parties at arm's length would share * * * [the spread or the grant date value]".  Thus, respondent contends that the spread and the grant date value amounts he determined automatically meet the arm's-length standard.  In support of his contention, respondent focuses on the meaning of the term "generally" in section 1.482-1(b)(1), Income Tax Regs.  He asserts:

> A rule that applies only "generally" must, by its own terms, have exceptions.  In light of the legislative history and extensive regulations interpreting the 1986 commensurate with income statutory amendment, qualified cost sharing arrangements constitute an appropriate exception from the general rule.

According to respondent, "the identification of costs, and the corresponding adjustments to the cost pool under qualified cost-sharing arrangements, should be determined without regard to the existence of uncontrolled transactions."  We disagree.

Respondent's interpretation of the word "generally" is incorrect because he ignores the preceding clause (i.e., "because identical transactions can rarely be located").  The regulation simply states that "comparable transactions" are the broad exception available when there are no identical transactions. See Union Carbide Corp. & Subs. v. Commissioner, 110 T.C. 375, 384 (1998) (stating "When the plain language of the statute or regulation is clear and unambiguous, * * * the inquiry * * * [ends].").  The regulation does not state that any allocation

proposed by respondent automatically produces an arm's-length result without reference to what arm's-length parties would do. Therefore, respondent's litigating position is contrary to his regulations. See Phillips v. Commissioner, 88 T.C. 529, 534 (1987) (stating respondent "may not choose to litigate against the officially published rulings * * * without first withdrawing or modifying those rulings. The result of contrary action is capricious application of the law"), affd. 851 F.2d 1492 (D.C. Cir. 1988). Pursuant to the express language of section 1.482-1(a)(1), Income Tax Regs., we conclude that the arm's-length standard is applicable in determining the appropriate allocation of costs pursuant to section 1.482-7, Income Tax Regs.

C.    Legislative and Regulatory History Support the
      Applicability of the Arm's-Length Standard to Section
      1.482-7, Income Tax Regs.

Respondent contends that the legislative and regulatory history relating to the 1986 amendment to section 482 establishes that, for purposes of determining the arm's-length result in cost-sharing arrangements, Congress intended to supplant the use of comparable transactions with internal measures of cost and profit.

It is unnecessary and inappropriate to resort to legislative, and certainly not to regulatory, history, because section 1.482-1(b)(1), Income Tax Regs., is unambiguous. Union Carbide Corp. & Subs. v. Commissioner, supra at 384. Even if the

regulations were ambiguous, our conclusion would not change because the legislative and regulatory history relating to section 482 supports our holding that the arm's-length standard is applicable in determining the appropriate allocation of costs pursuant to section 1.482-7, Income Tax Regs.

In 1986, Congress amended section 482 by adding "In the case of any transfer * * * of intangible property * * * the income with respect to such transfer * * * shall be commensurate with the income attributable to the intangible."  This change reflected a concern that the statute had failed to effectively prevent transfer pricing abuses in controlled transactions (e.g., companies transferring intangibles to related foreign companies in exchange for a "relatively low royalty [rate]" based on "industry norms for transfers of less profitable intangibles."). H. Rept. 99-426, at 424 (1985), 1986-3 C.B. (Vol. 2) 424; accord Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1014-1015 (J. Comm. Print 1987); see H. Rept. 99-426, supra at 424-425, 1986-3 C.B. (Vol. 2) 424-425. The committee stated:

> In making this change, Congress intended to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor payment for related party intangibles transfers.

H. Rept. 99-426, at 414 (1985), 1986-23 C.B. (Vol. 2) 424.  The committee concluded: "it is appropriate to require that the

payment made on a transfer of intangibles to a related foreign
corporation * * * be commensurate with the income attributable to
the intangible." H. Rept. 99-426 at 414 (1985), 1986-23 C.B.
(Vol. 2) 424.

Respondent contends that the regulatory history, including
Treasury's publication of Notice 88-123, 1988-2 C.B. 458 (the
White Paper), establishes that the commensurate with income
standard replaced the arm's-length standard mandated in section
1.482-1, Income Tax Regs. We note that regulatory history, like
legislative history, is a far less accurate embodiment of intent
than plain language and is susceptible to a wide array of
interpretations. Nevertheless, our conclusion is consistent with
the White Paper and the 1992 and 1995 regulations. Contrary to
respondent's contentions, the commensurate with income standard
was intended to supplement and support, not supplant, the arm's-
length standard. Nothing in section 482, its accompanying
regulations, or its legislative history indicates that internal
measures of cost and profit should be used to the exclusion of
the arm's-length standard.

The White Paper reexamined the theory and administration of
section 482 and concluded:

    Looking at the income related to the intangible and
    splitting it according to relative economic
    contributions is consistent with what unrelated parties
    do. The general goal of the commensurate with income
    standard is, therefore, to ensure that each party earns

> the income or return from the intangible that an
> unrelated party would earn in an arm's length transfer
> of the intangible.

Notice 88-123, 1988-2 C.B. 458, 472.  In 1992, respondent promulgated regulations, interpreting section 482, which were finalized in 1995.  Neither the 1992 nor 1995 regulations contain language indicating any intention to remove the arm's-length standard with respect to cost-sharing determinations or prevent consideration of uncontrolled transactions.  In fact, the preamble to the 1992 proposed regulations states that section 1.482-1(b)(1), Income Tax Regs., "clarifies the general meaning of the arm's length standard * * * [as] whether uncontrolled taxpayers exercising sound business judgment would have agreed to the same terms given the actual circumstances under which controlled taxpayers dealt."  See DHL Corp. & Subs. v. Commissioner, 285 F.3d 1210, 1222 (9th Cir. 2002) (relying on the preamble to interpret section 1.482-2(d), Income Tax Regs.); Armco, Inc. v. Commissioner, 87 T.C. 865, 868 (1986) (stating "A preamble will frequently express the intended effect of some part of a regulation * * * [and] might be helpful in interpreting an ambiguity in a regulation."); Proposed Income Tax Regs., 57 Fed. Reg. 3571 (Jan. 30, 1992).

Finally, respondent contends that the general rules of statutory interpretation require us to construe the regulations in a manner that "avoids conflict within the regulatory scheme,

and harmonizes with the underlying * * * [statute's]" purpose. The Court, however, will not ignore the regulations' explicit terms in order to accommodate respondent's litigating position. While Treasury has the authority to modify its regulations to resolve any conflict within the regulatory scheme, we must "apply the provisions of respondent's regulations as we find them and not as we think they might or ought to have been written." Larson v. Commissioner, 66 T.C. 159, 186 (1976). The arm's-length standard is included without exception, and the 1986 modification of section 482 did not eliminate the use of comparable transactions in determining a controlled taxpayer's income. Section 1.482-1, Income Tax Regs., explicitly provides that the arm's-length standard applies to "all transactions". Cost-sharing determinations pursuant to section 1.482-7, Income Tax Regs., are not exempted. Accordingly, if unrelated parties would not share the spread or the grant date value, respondent's determinations are arbitrary and capricious.

D.    Unrelated Parties Would Not Share the Spread or
      Grant Date Value

Respondent contends that unrelated parties "implicitly" share the spread[12] and the grant date value,[13] but both parties

---

[12]    As a result of respondent's Oct. 21, 2003, amendment to answer, the parties dispute who has the burden of proof with respect to the spread theory. Our conclusion is based on the preponderance of the evidence. Thus, the burden of proof is
(continued...)

agree that unrelated parties would not explicitly share these amounts. Indeed, Scott T. Newlon, the only witness proffered by respondent to address this issue, testified that parties "don't * * * explicitly [share any amount for ESOs] because * * * it would be hard for the parties to agree on a measurement * * * and it may * * * [leave them] open to * * * potential disputes." These considerations are aptly summarized by Irving Plotkin, one of petitioners' experts, who testified:

> In the real world, these measures [the spread and grant date value] are so speculative and controversial, and the link between them and the value of R&D functions performed by the ESO holder is so tenuous, that unrelated parties in joint research arrangement simply do not agree to pay any amount for ESOs granted to the employees of an entity providing R&D services.

Petitioners also established that, for product pricing purposes, companies (i.e., those who enter into cost-sharing arrangements relating to intangibles) do not take into account the spread or the grant date value relating to ESOs.

While respondent concedes that unrelated parties do not explicitly share costs attributable to ESOs, he contends that unrelated parties "negotiate terms that implicitly compensate

---

[12](...continued) immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

[13] Because we determined, in our June 3, 2004, order, that the grant date theory is a new matter, respondent bears the burden of proof with respect to this theory. Rule 142(a); Shea v. Commissioner, 112 T.C. 183 (1999).

* * * [development] costs not directly shared or reimbursed." (Emphasis added.) Respondent, however, did not present any credible evidence that unrelated parties implicitly share the spread or grant date value related to ESOs. Scott T. Newlon, the only witness respondent proffered to address this issue, did not reference any other economists, unpublished or published articles, or any transactions supporting his theory. In fact, he conceded that it was not possible to test whether parties implicitly include ESOs as a compensation cost in cost-sharing agreements. Petitioners, however, through the testimony of numerous credible witnesses, established that companies do not implicitly take into account the spread or the grant date value for purposes of determining costs relating to cost-sharing agreements. Furthermore, petitioners established that if unrelated parties believed that the spread and grant date value were costs related to intangible development activities, such parties would be very explicit about their treatment for purposes of their agreements. In short, respondent's implicit cost theory is specious and unsupported.

### 1. The Spread

Unrelated parties would not share the spread because it is difficult to estimate, unpredictable, and potentially large in amount. Petitioners' uncontradicted evidence established that certainty and control are of paramount importance to unrelated

parties involved in cost-sharing arrangements. Yet, the size of the spread is affected by a variety of factors, many of which are not within the control of the contracting parties. More specifically, the size of the spread is based on the exercise price and the stock price on the exercise date. It is indisputable that changes in stock prices are frequent and unpredictable, and that a wide variety of external factors may influence such prices. In fact, the entire market, or stock in individual companies, may move up or down based on market and industry trends and a myriad of factors including, but not limited to, inflation, interest and unemployment rates, consumer demand, energy prices, programmed trading, etc. As a result, petitioner's stock price may move in response to such trends and be affected by these factors. For example, respondent concedes that he does not know whether the rises in petitioner's stock price were attributable to increases in the market as a whole or the semiconductor industry in particular.

Stock prices are also sometimes affected by investor trading based on erroneous information. In such cases, a temporary change in stock price may be based on transient misperceptions of value among investors.

The spread is also significantly affected by an employee's investment decision regarding when to exercise the option. Indeed, the timing of the ESO-holder's decision to exercise the

ESO may have a dramatic impact on the size of the spread. While the exercise price is fixed at the grant date, the value of the stock is not fixed until the ESO-holder exercises the option. This personal decision is based on the employee's liquidity needs, aversion to risks, and other miscellaneous factors. In essence, the market and ESO-holder, rather than the contracting parties, determine the size of the spread and when the spread will be incurred. Simply put, rational profit-maximizing unrelated parties would not cede this control over costs or be willing to accept such a high degree of uncertainty relating to costs.

In short, the value of petitioner's stock, and thus the potential size of the spread relating to ESOs, could rise and fall in line with the vicissitudes and vagaries of the market. The semiconductor industry, of which petitioner is a prominent member, may be particularly subject to these types of market swings and trends. Thus, the spread is affected by a myriad of factors and calculated and incurred at a point in time when the contracting parties have no control over the amount.

Finally, we note that sharing the spread could also create perverse incentives for unrelated parties. One of petitioners' experts, Mukesh Bajaj, stated:

> A well-designed economic contract would ensure that both partners have an incentive in seeing the value of the other partner rise. If * * * the Spread * * * has

to be cost-shared, the cost sharing partner has a
perverse incentive to diminish (or at least help
contain) the stock price of the other firm because the
lower this price, the less the spread-based cost that
the partner has to bear.

Unrelated parties would not be inclined to enter into a contract
which contains terms that could encourage such counterproductive
conduct.  Accordingly, respondent's allocation relating to the
spread theory fails to meet the arm's-length standard mandated by
section 1.482-1(b), Income Tax Regs.[14]

### 2.  Grant Date Value

Respondent, who had the burden of proof with respect to the
grant date theory, presented no evidence that unrelated parties
would, pursuant to the FVM, make a cost-sharing allocation of at-
the-money options or ESPP purchase rights.  To the contrary,
petitioners' uncontradicted evidence established that in
determining cost allocations unrelated parties would not include
any cost related to the issuance of ESOs.  In essence, respondent
contends that petitioner was required to allocate, and thereby
sustain tangible economic consequences relating to, an amount
that unrelated parties do not treat as an expense for tax or

---

[14]  Petitioners' treatment of the spread as a reimbursable
expense for purposes of its intercompany agreement with XI has no
bearing on our conclusion.  Sec. 482 looks to transactions
between unrelated, not related, parties to determine whether the
arm's-length standard in sec. 1.482-1, Income Tax Regs., has been
satisfied.

financial accounting purposes.[15]  Accordingly, respondent's

allocation relating to the grant date value fails to meet the

arm's-length standard mandated by section 1.482-1(b), Income Tax

Regs.

During the years in issue, petitioners employed the IVM,

which did not treat at-the-money options as expenses.  From 1972

until December 15, 1995, the IVM was the only financial

accounting method authorized by FASB for measuring and reporting

the value of options, and thus, the only available method during

the first year of petitioner's cost-sharing agreement.

Thereafter, the FVM was the preferred method, yet petitioners

were under no affirmative obligation to elect the FVM.[16]  In

addition, during the years in issue most companies used the IVM

for purposes of valuing ESOs.[17]  Thus, consistent with the

---

[15] ESOs generally do not have an ascertainable fair market
value on the grant date for purposes of sec. 1.83-7(b)(3), Income
Tax Regs.  Thus, the grant date value is not a tax expense
pursuant to sec. 83.  During the years in issue, most companies
used the IVM, and thus, were not required, for financial
accounting purposes, to record an expense relating to options
issued at-the-money and certain ESPP purchase rights.

[16]  In 1996, petitioner employed the IVM to calculate ESO
costs.  Respondent, in his Dec. 28, 2000, notice of deficiency,
determined that petitioner's 1996 cost-sharing pool should be
increased by $14,939,494 relating to stock options and ESPP
purchase rights.  The parties subsequently stipulated that this
amount would not be included in the 1996 cost-sharing pool.

[17]  Although the IVM has been criticized for not measuring
the call premium of an ESO, both parties' experts acknowledged
that an ESO's call premium may have some value but cast doubt on
(continued...)

parties' expert testimony, unrelated parties would treat ESOs in a manner consistent with the IVM, rather than the FVM.[18] Accordingly, petitioners' allocation relating to its ESOs satisfies the arm's-length standard in section 1.482-1(b), Income Tax Regs.

## IV.   Section 6662(a) Penalty

Section 6662(a) imposes a 20-percent accuracy-related penalty on the portion of an underpayment of tax which is attributable to a taxpayer's negligence or disregard of rules or regulations.  Sec. 6662(b)(1).  Because we reject respondent's determinations, petitioners are not liable for section 6662(a) penalties.

## V.   Conclusion

The express language in section 1.482-1(a)(1), Income Tax Regs., establishes that the arm's-length standard applies to section 1.482-7, Income Tax Regs., for purposes of determining appropriate cost allocations.  Because unrelated parties would not share the spread or the grant date value, respondent's imposition of such a requirement is inconsistent with section

---

[17](...continued)
whether it could be reliably measured.

[18]   The parties stipulated that "Immediately after SFAS 123 became effective, the vast majority of public companies chose to continue to follow the intrinsic value method of APB 25."  No evidence, however, was presented concerning the companies who used the FVM.

1.482-1, Income Tax Regs.  Simply put, the regulations applicable to the years in issue did not authorize respondent to require taxpayers to share the spread or the grant date value relating to ESOs.  Petitioners are merely required to be compliant, not prescient.  Accordingly, we hold that respondent's allocations are arbitrary and capricious; petitioners' allocations meet the arm's-length standard mandated by section 1.482-1, Income Tax Regs.; and petitioners are not liable for the section 6662(a) penalties.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing and concessions made by the parties,

<u>Decisions will be entered under Rule 155</u>.

[Reporter's Note:  This opinion was modified by Order dated September 29, 2005.]