ALTERA CORPORATION AND SUBSIDIARIES, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6253–12, 9963–12.        Filed July 27, 2015.

In *Xilinx Inc. v. Commissioner*, 125 T.C. 37 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010), we held that, under the 1995 cost-sharing regulations, controlled entities entering into qualified cost-sharing agreements (QCSAs) need not share stock-based compensation (SBC) costs because parties operating at arm's length would not do so. In 2003 Treasury issued sec. 1.482–7(d)(2), Income Tax Regs. (final rule). The final rule requires controlled parties entering into QCSAs to share SBC costs. P is an affiliated group of corporations that filed consolidated returns for the years in issue. A–US, the parent company, is a Delaware corporation, and A–I, a subsidiary of A–US, is a Cayman Islands corporation. A–US and A–I entered into a QCSA. During its 2004–07 taxable years A–US granted SBC to its employees. A–US did not share the SBC costs with A–I. R determined deficiencies based on I.R.C. sec. 482 allocations R made pursuant to the final rule. P and R have filed cross-motions for partial summary judgment. P contends that the final rule is arbitrary and capricious under 5 U.S.C. sec. 706(2)(A) and *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983). R contends that the final rule is valid under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), or alternatively, under *State Farm*. *Held*: The final rule is a legislative rule—i.e., it is not an interpretive rule under 5 U.S.C. sec. 553(b)—because it has the force of law. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). The final rule has the force of law because in I.R.C. sec. 7805(a) "Congress has delegated legislative power to" Treasury, *id.*, and Treasury "intended to exercise that power" when it issued the final rule, *id. Held*, *further*, whether *State Farm* or *Chevron* supplies the standard of review is immaterial because *Chevron* step 2 incorporates the reasoned decisionmaking standard of *State Farm*, *see Judulang v. Holder*, 565 U.S. ___, ___, 132 S. Ct. 476, 483 n.7 (2011), and we are being asked to decide whether Treasury reasonably concluded that the final rule is consistent with the arm's-length standard. *Held*, *further*, Treasury failed to support its belief that unrelated parties would share SBC costs with any evidence in the administrative record, *see State Farm*, 463 U.S. at 43; failed to articulate why all QCSAs should be treated identically, *see id.*; and failed to respond to significant comments, *see Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977). Additionally, Treasury's "explanation for its decision * * * runs

counter to the evidence before" it. *State Farm*, 463 U.S. at 43. *Held*, *further*, the harmless error rule of 5 U.S.C. sec. 706 is inapplicable because it is not clear that Treasury would have adopted the final rule if it had been determined to be inconsistent with the arm's-length standard. *Held*, *further*, the final rule fails to satisfy *State Farm*'s reasoned decisionmaking standard and is therefore invalid. *See* 5 U.S.C. sec. 706(2)(A); *State Farm*, 463 U.S. at 43.

*Andrew P. Crousore*, *Donald M. Falk*, *Joseph B. Judkins*, *Thomas Lee Kittle-Kamp*, *William G. McGarrity*, *Kristyn A. Medina*, *Brian D. Netter*, *Phillip J. Taylor*, and *Allen Duane Webber*, for petitioner.

*Farhad Asghar*, *Kevin G. Croke*, *Anne O'Brien Hintermeister*, *Allan Lang*, *Aaron T. Vaughan*, and *Mary E. Wynne*, for respondent.

## OPINION

MARVEL, *Judge*: These consolidated cases are before the Court on the parties' cross-motions for partial summary judgment under Rule 121.[1] The issue presented by the parties' cross-motions is whether section 1.482–7(d)(2), Income Tax Regs. (final rule)—which the Department of the Treasury (Treasury) issued in 2003 and which requires participants in qualified cost-sharing arrangements (QCSAs) to share stock-based compensation costs to achieve an arm's-length result— is arbitrary and capricious and therefore invalid.

### *Background*

Petitioner is an affiliated group of corporations that filed consolidated Federal income tax returns for the years at issue. During all relevant years, Altera Corp. (Altera U.S.), the parent company, was a Delaware corporation, and Altera International, a subsidiary of Altera U.S., was a Cayman Islands corporation. When petitioner filed its petitions with this Court, the principal place of business of Altera U.S. was in California.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All APA section references are to the Administrative Procedure Act (APA), 5 U.S.C. secs. 551–559, 701–706 (2012).

I. *Petitioner's R&D Cost-Sharing Agreement*

Petitioner develops, manufactures, markets, and sells programmable logic devices (PLDs) and related hardware, software, and pre-defined design building blocks for use in programming the PLDs (programming tools). Altera U.S. and Altera International entered into concurrent agreements that became effective May 23, 1997: a master technology license agreement (technology license agreement) and a technology research and development cost-sharing agreement (R&D cost-sharing agreement).

Under the technology license agreement, Altera U.S. licensed to Altera International the right to use and exploit, everywhere except the United States and Canada, all of Altera U.S.' intangible property relating to PLDs and programming tools that existed before the R&D cost-sharing agreement (pre-cost-sharing intangible property). In exchange for the rights granted under the technology license agreement, Altera International paid royalties to Altera U.S. in each year from 1997 through 2003. As of December 31, 2003, Altera International owned a fully paid-up license to use the pre-cost-sharing intangible property in its territory.

Under the R&D cost-sharing agreement, Altera U.S. and Altera International agreed to pool their respective resources to conduct research and development using the pre-cost-sharing intangible property. Under the R&D cost-sharing agreement, Altera U.S. and Altera International agreed to share the risks and costs of research and development activities they performed on or after May 23, 1997. The R&D cost-sharing agreement was in effect from May 23, 1997, through 2007.

During each of petitioner's taxable years ending December 31, 2004, December 30, 2005, December 29, 2006, and December 28, 2007 (2004–07 taxable years), Altera U.S. granted stock options and other stock-based compensation to certain of its employees. Certain of the employees of Altera U.S. who performed research and development activities subject to the R&D cost-sharing agreement received stock options or other stock-based compensation. The employees' cash compensation was included in the cost pool under the R&D cost-sharing agreement. Their stock-based compensation was not included.

Pursuant to the R&D cost-sharing agreement, Altera International made the following cost-sharing payments to Altera U.S. for its 2004–07 taxable years:

| Year | Cost-sharing payment |
|------|---------------------|
| 2004 ............................... | $129,469,233 |
| 2005 ............................... | 160,722,953 |
| 2006 ............................... | 164,836,577 |
| 2007 ............................... | 192,755,438 |

## II. *Petitioner's Tax Reporting and Respondent's Section 482 Allocations*

Petitioner timely filed its Forms 1120, U.S. Corporation Income Tax Return, for its 2004–07 taxable years. Respondent timely mailed notices of deficiency to petitioner with respect to its 2004–07 taxable years. The notices of deficiency allocated, pursuant to section 482, income from Altera International to Altera U.S. by increasing Altera International's cost-sharing payments for 2004–07 by the following amounts:

| Year | Cost-sharing payment adjustment |
|------|---------------------|
| 2004 ............................... | $24,549,315 |
| 2005 ............................... | 23,015,453 |
| 2006 ............................... | 17,365,388 |
| 2007 ............................... | 15,463,565 |

Bringing petitioner into compliance with the final rule was the sole purpose of the cost-sharing adjustments in the notice of deficiency.

## III. *Section 482*

### A. *Arm's-Length Standard*

Section 482 authorizes the Commissioner to allocate income and expenses among related entities to prevent tax evasion and to ensure that taxpayers clearly reflect income relating to transactions between related entities. The first sentence of section 482 provides, in relevant part, as follows:

> In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the Sec-

retary[2] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. * * *

Section 1.482–1(a)(1), Income Tax Regs., explains the purpose of section 482 as follows:

> The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer[3] on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. * * *

Section 1.482–1(b)(1), Income Tax Regs., provides that

> [i]n determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. * * *

The arm's-length standard is also incorporated into numerous income tax treaties between the United States and foreign countries. *See, e.g.*, Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and on Capital Gains, U.S.-U.K. (2001 U.S.-U.K. Income Tax Convention), art. 9, July 24, 2001, Tax Treaties (CCH) para. 10,901.09, at 201,019; U.S. Model Income Tax Convention of Nov. 15, 2006 (2006 U.S. Model Income Tax Convention), art. 9, Tax Treaties (CCH) para. 209.09, at 10,559; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306 ("This Article incorporates in the Convention the arm's-length prin-

---

[2] The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

[3] The term "controlled taxpayer" means "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers." Sec. 1.482–1(i)(5), Income Tax Regs.

ciple reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482."); Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties (CCH) para. 215, at 10,640 (same).

B. *Commensurate-With-Income Standard*

In 1986 Congress amended section 482 by adding, in relevant part, the following sentence: "In the case of any transfer (or license) of intangible property * * *, the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. No. 99–514, sec. 1231(e)(1), 100 Stat. at 2562.

The House report that accompanied the House version of the 1986 amendment to section 482 states, in relevant part, as follows:

> Many observers have questioned the effectiveness of the "arm's length" approach of the regulations under section 482. A recurrent problem is the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables.
>
>      \*    \*    \*    \*    \*    \*    \*
>
> The problems are particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers may transfer such intangibles to foreign related corporations or to possession corporations at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product. Even in the case of a proven high-profit intangible, taxpayers frequently take the position that intercompany royalty rates may appropriately be set on the basis of industry norms for transfers of much less profitable items.
>
> Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors.\* \* \*
>
> In many cases firms that develop high profit-potential intangibles tend to retain their rights or transfer them to related parties in which they retain an equity interest in order to maximize their profits. \* \* \* Industry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases.

There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation or possessions corporation be commensurate with the income attributable to the intangible. * * *

* * * * * * *

The basic requirement of the bill is that payments with respect to intangibles that a U.S. person transfers to a related foreign corporation or possessions corporation must be commensurate with the income attributable to the intangible. * * *

In making this change, the committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangibles transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms. * * *

* * * * * * *

In requiring that payments be commensurate with the income stream, the bill does not intend to mandate the use of the "contract manufacturer" or "cost-plus" methods of allocating income or any other particular method. As under present law, all the facts and circumstances are to be considered in determining what pricing methods are appropriate in cases involving intangible property, including the extent to which the transferee bears real risks with respect to its ability to make a profit from the intangible or, instead, sells products produced with the intangible largely to related parties (which may involve little sales risk or activity) and has a market essentially dependent on, or assured by, such related parties' marketing efforts. However, the profit or income stream generated by or associated with intangible property is to be given primary weight.

[H.R. Rept. No. 99–426, at 423–426 (1985), 1986–3 C.B. (Vol. 2) 1, 423–426.]

The conference report that accompanied the 1986 amendment to section 482 states, in relevant part, as follows:

In view of the fact that the objective of these provisions—that the division of income between related parties reasonably reflect the relative economic activity undertaken by each—applies equally to inbound transfers, the conferees concluded that it would be appropriate for these principles to apply to transfers between related parties generally if income must otherwise be taken into account.

* * * * * * *

The conferees are also aware that many important and difficult issues under section 482 are left unresolved by this legislation. The conferees

believe that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect.

In revising section 482, the conferees do not intend to preclude the use of certain bona fide research and development cost-sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each. Under such a bona fide cost-sharing arrangement, the cost-sharer would be expected to bear its portion of all research and development costs, on unsuccessful as well as successful products within an appropriate product area, and the costs of research and development at all relevant development stages would be included. In order for cost-sharing arrangements to produce results consistent with the changes made by the Act to royalty arrangements, it is envisioned that the allocation of R&D cost-sharing arrangements generally should be proportionate to profit as determined before deduction for research and development. In addition, to the extent, if any, that one party is actually contributing funds toward research and development at a significantly earlier point in time than the other, or is otherwise effectively putting its funds at risk to a greater extent than the other, it would be expected that an appropriate return would be required to such party to reflect its investment.

[H.R. Conf. Rept. No. 99–841 (Vol. II), at II–637 through II–638 (1986), 1986–3 C.B. (Vol. 4) 1, 637–638.]

## C. *Treasury's Position That the Commensurate-With-Income Standard Was Intended To Work Consistently With the Arm's-Length Standard*

As the conference report suggested, Treasury and the Internal Revenue Service (IRS) conducted a comprehensive study of the regulations under section 482, the results of which they published in Notice 88–123, 1988–2 C.B. 458 (1988 White Paper).

The 1988 White Paper concluded that the arm's-length standard is the international norm for making transfer pricing adjustments. *Id.*, 1988–2 C.B. at 475 ("The arm's length standard is embodied in all U.S. tax treaties; it is in each major model treaty, including the U.S. Model Convention; it is incorporated into most tax treaties to which the United States is not a party; it has been explicitly adopted by international organizations that have addressed themselves to transfer pricing issues; and virtually every major industrial nation takes the arm's length standard as its

frame of reference in transfer pricing cases." (Fn. ref. omitted.)). The 1988 White Paper further concluded that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard. *See id.* ("To allay fears that Congress intended the commensurate with income standard to be implemented in a manner inconsistent with international transfer pricing norms and U.S. treaty obligations, Treasury officials publicly stated that Congress intended no departure from the arm's length standard, and that the Treasury Department would so interpret the new law.").

The 1988 White Paper explained that the commensurate-with-income standard is consistent with the arm's-length standard because

> [l]ooking at the income related to the intangible and splitting it according to relative economic contributions is consistent with what unrelated parties do. The general goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible. [*Id.*, 1988–2 C.B. at 472.]

Accordingly, in technical explanations to numerous income tax treaties that the United States has entered into since then, Treasury has repeatedly affirmed that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard. *See, e.g.*, Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,307 ("It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard."); Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties (CCH) para. 215, at 10,640–10,641 (same).

## IV. *1995 Cost-Sharing Regulations*

We have previously considered whether controlled taxpayers must include stock-based compensation in the pool of costs to be shared. Most recently, in *Xilinx Inc. v. Commissioner*, 125 T.C. 37 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010), we addressed the treatment of stock-based compensa-

tion with respect to taxable years subject to cost-sharing regulations that Treasury finalized in 1995 (1995 cost-sharing regulations). Because our findings and conclusions, and the conclusions of the U.S. Court of Appeals for the Ninth Circuit, in *Xilinx* are relevant in these cases, we briefly review the 1995 cost-sharing regulations, our Opinion in *Xilinx*, and the opinions of the U.S. Court of Appeals for the Ninth Circuit in that case.

A. *Regulatory Provisions*

The 1995 cost-sharing regulations prohibited the District Director from making allocations under section 482 "except to the extent necessary to make each controlled participant's share of the costs * * * of intangible development under the qualified cost-sharing arrangement equal to its share of reasonably anticipated benefits attributable to such development". T.D. 8632, 1996–1 C.B. 85, 90. The 1995 cost-sharing regulations further provided that "a controlled participant's costs of developing intangibles * * * [include] all of the costs incurred by that participant related to the intangible development area". *Id.*, 1996–1 C.B. at 92.

B. *Our Opinion in Xilinx*

In *Xilinx Inc. v. Commissioner*, 125 T.C. 37, the taxpayer challenged deficiencies determined under the 1995 cost-sharing regulations on the basis of the Commissioner's determination that the taxpayer should have included the value of stock-based compensation in the intangible development cost pool. Assuming arguendo that the value of stock-based compensation is a cost under the 1995 cost-sharing regulations, we held that the Commissioner's allocations failed to satisfy the arm's-length standard of section 1.482–1(b)(1), Income Tax Regs. *See id.* at 53.

In reaching this holding we concluded that, consistent with the 1995 cost-sharing regulations, (1) in determining the true taxable income of a controlled taxpayer, the arm's-length standard applies in all cases, *see id.* at 54–55; (2) the arm's-length standard requires an analysis of what unrelated entities would do, *see id.* at 53–54; (3) the commensurate-with-income standard was never intended to supplant the arm's-length standard, *see id.* at 56–58; and (4) unrelated parties

would not share the exercise spread or grant date value[4] of stock-based compensation, *see id.* at 58–62.

In concluding that unrelated parties would not share either the exercise spread or grant date value of stock-based compensation, (1) we observed that the Commissioner's expert agreed that unrelated parties would not explicitly share the exercise spread or grant date value of stock-based compensation because unrelated parties would find it hard to agree how to measure such value and because doing so would leave them open to potential disputes, *see id.* at 58; (2) we found that the taxpayers proved that companies do not take into account either the exercise spread or grant date value of stock-based compensation for product pricing purposes, *see id.* at 59; (3) we observed that the Commissioner produced no credible evidence showing that unrelated parties implicitly share the exercise spread or grant date value of stock-based compensation, *see id.*; (4) we credited the testimony of the taxpayers' numerous fact witnesses who testified that unrelated parties do not share either the exercise spread or grant date value of stock-based compensation in cost-sharing agreements, *see id.*; (5) we found that the taxpayers proved that "if unrelated parties believed that the spread and grant date value were costs", they "would be very explicit about their treatment", *id.*; (6) we credited the testimony of the taxpayers' expert who testified that unrelated parties would not agree to share spread-based cost because doing so would create perverse incentives for each party to diminish the stock price of the other, *see id.* at 61; and (7) we observed that during the years in issue the grant value of stock-based compensation was generally not treated as an expense for tax and financial accounting purposes, *see id.* at 61–62.

## C. *The Ninth Circuit Opinions in Xilinx*

The U.S. Court of Appeals for the Ninth Circuit initially reversed our Opinion in *Xilinx*. The majority opinion by Judge Fisher reasoned that "[b]ecause the all costs requirement [of the 1995 cost-sharing regulations] is irreconcilable

---

[4] The exercise spread value is the spread between the option strike price and the price of the underlying stock when the option is exercised. *See Xilinx Inc. v. Commissioner*, 125 T.C. 37, 47 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010). The grant date value is the fair market value of the option on its grant date. *See id.* at 50.

with the arm's length standard," the more specific all costs requirement controls. *Xilinx Inc. v. Commissioner*, 567 F.3d 482, 489 (9th Cir. 2009), *rev'g and remanding* 125 T.C. 37, *withdrawn*, 592 F.3d 1017 (9th Cir. 2010). The dissenting opinion by Judge Noonan agreed that the regulations were irreconcilable, *see id.* at 497 (Noonan, J., dissenting), but concluded that the all costs requirement should be construed as not applying to stock-based compensation because (1) the regulations should be interpreted in the light of the dominant purpose of the statute—"parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions", *id.* at 498; (2) any inconsistencies in the regulations should be construed against the Government, *see id.*; and (3) Treasury's technical explanation of the income tax convention between the United States and Ireland confirms that the commensurate-with-income standard is meant to work consistently with the arm's-length standard, *see id.* at 498–500 ("This article incorporates in the Convention the arm's[-]length principle reflected in the U.S. domestic transfer pricing provision, particularly Code section 482. * * * It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard." (quoting Treasury Department Technical Explanation of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains Signed at Dublin on July 28, 1997, and the Protocol Signed at Dublin on July 28, 1997 (1997 U.S.-Ir. Income Tax Convention and Protocol), U.S.-Ir., Tax Treaties (CCH) para. 4435, at 103,223)).

The Court of Appeals subsequently withdrew its opinion in *Xilinx* and issued a new opinion affirming our Opinion in *Xilinx*. The new opinion by Judge Noonan was in substance similar to his original dissenting opinion, with the exception that the new opinion did not rest its reasoning on the notion that inconsistencies in the regulations should be resolved against the Government. *See Xilinx Inc. v. Commissioner*, 598 F.3d at 1191–1197 (Noonan, J.).

Judge Fisher's concurring opinion first explained the parties' "dueling interpretations of the 'arm's length standard'". *Id.* at 1197 (Fisher, J., concurring). According to Judge

Fisher, Xilinx contended that the arm's-length standard required "controlled parties * * * [to] share only those costs uncontrolled parties share." *Id.* By contrast, the Commissioner contended that

> analyzing comparable transactions is unhelpful in situations where related and unrelated parties always occupy materially different circumstances. As applied to sharing * * * [employee-stock-option (ESO)] costs, the Commissioner argues (consistent with the tax court's findings) that the reason unrelated parties do not, and would not, share ESO costs is that they are unwilling to expose themselves to an obligation that will vary with an unrelated company's stock price. Related companies are less prone to this concern precisely because they are related—i.e., because XI is wholly owned by Xilinx, it is already exposed to variations in Xilinx's overall stock price, at least in some respects. * * * [*Id.*]

Judge Fisher concluded "that Xilinx's understanding of the regulations is the more reasonable even if the Commissioner's current interpretation may be theoretically plausible." *Id.* at 1198. He further explained that "we need not defer to * * * [the Commissioner's interpretation of the arm's-length standard] because he has not clearly articulated his rationale until now." *Id.* (citing *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518–519 & n.9 (1992)). In a footnote Judge Fisher added: "It is an open question whether these flaws have been addressed in the new regulations Treasury issued after the tax years at issue in this case." *Id.* n.4. Notwithstanding Judge Fisher's concerns, Judge Reinhardt, dissenting, would have continued to adhere to the panel's original opinion. *See id.* at 1199–1200 (Reinhardt, J., dissenting).

## V. *2003 Cost-Sharing Regulations*

### A. *Notice of Proposed Rulemaking*

In July 2002 Treasury issued a notice of proposed rulemaking and notice of a public hearing (NPRM) with respect to proposed amendments to the 1995 cost-sharing regulations. The NPRM set a public hearing on the proposed amendments for November 20, 2002. *See* 67 Fed. Reg. 48997 (July 29, 2002). The preamble to the NPRM states that the proposed amendments to the 1995 cost-sharing regulations sought to clarify

that stock-based compensation must be taken into account in determining operating expenses under § 1.482–7(d)(1)[, Income Tax Regs.,] and to provide rules for measuring stock-based compensation costs * * * [, and] to include express provisions to coordinate the cost sharing rules of § 1.482–7[, Income Tax Regs.,] with the arm's length standard as set forth in § 1.482–1[, Income Tax Regs.]. [*Id.* at 48998.]

B. *Comments Submitted in Response to the Proposed Regulations*

In response to the NPRM the following persons and organizations submitted written comments to Treasury: (1) American Electronics Association (AeA); (2) Baker & McKenzie, LLP, on behalf of the Software Finance and Tax Executives Council (SoFTEC); (3) Deloitte & Touche, LLP; (4) Ernst & Young LLP, on behalf of the Global Competitiveness Coalition (Global); (5) Fenwick & West, LLP (Fenwick); (6) Financial Executives International (FEI); (7) Information Technology Association of America; (8) Information Technology Industry Council; (9) KPMG, LLP; (10) PricewaterhouseCoopers, LLP (PwC); (11) Irish Office of the Revenue Commissioners; (12) Joseph A. Grundfest, W.A. Franke Professor of Law and Business, Stanford Law School; (13) Xilinx Inc. Additionally, the following four persons spoke at the November 20, 2002, public hearing: (1) Eric D. Ryan, of PwC; (2) Ron Schrotenboer, of Fenwick; (3) John M. Peterson, Jr., of Baker & McKenzie, LLP and on behalf of SoFTEC; and (4) Caroline Graves Hurley, of AeA.[5]

Several of the commentators informed Treasury that they knew of no transactions between unrelated parties, including any cost-sharing arrangement, service agreement, or other contract, that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation.

AeA provided to Treasury the results of a survey of its members. AeA member companies reviewed their arm's-length codevelopment and joint venture agreements and found none in which the parties shared stock-based compensation. For those agreements that did not explicitly address the treatment of stock-based compensation, the

---

[5] Tax Analysts prepared a written transcript of the November 20, 2002, hearing. Treasury did not request or pay for the transcript and did not identify it as an "official" transcript.

companies reviewed their accounting records and found none in which any costs associated with stock-based compensation were shared.

AeA and PwC represented to Treasury that they conducted multiple searches of the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system[6] and found no cost-sharing agreements between unrelated parties in which the parties agreed to share either the exercise spread or grant date value of stock-based compensation.

Several commentators identified arm's-length agreements in which stock-based compensation was not shared or reimbursed. For example, (1) AeA identified, and PwC provided, a 1997 collaboration agreement between Amylin Pharmaceuticals, Inc., and Hoechst Marion Roussel, Inc. (Amylin-HMR collaboration agreement), that did not include stock options in the pool of costs to be shared; (2) PwC identified a joint development agreement between the biotechnology company AgraQuest, Inc., and Rohm & Haas under which only "out-of-pocket costs" would be shared; (3) PwC identified a 1999 cost-sharing agreement between software companies Healtheon Corp. and Beech Street Corp. that expressly excluded stock options from the pool of expenses to be shared. Additionally, in written comments, and again at the November 20, 2002, hearing, Ms. Hurley offered to provide Treasury with more detailed information regarding several agreements involving AeA member companies, provided that the companies received adequate assurances that their proprietary information would not be disclosed.[7]

FEI submitted model accounting procedures from the Council of Petroleum Accountant Societies (COPAS) for sharing costs among joint operating agreement partners in the petroleum industry. FEI noted that COPAS recommends that joint operating agreements should not allow stock

---

[6] EDGAR is maintained by the Securities and Exchange Commission (SEC) and is a public and searchable database that provides users with free access to registration statements, periodic reports, and other forms filed by companies, including "material contracts" that are required by law to be attached as exhibits to certain SEC forms.

[7] Respondent admits that Treasury never had any discussions with the AeA member companies regarding the arm's-length cost-sharing agreements that the AeA member companies offered to discuss.

options to be charged against the joint account because they are difficult to accurately value.

AeA, SoFTEC, KPMG, and PwC cited the practice of the Federal Government, which regularly enters into cost-reimbursement contracts at arm's length. They noted that Federal acquisition regulations prohibit reimbursement of amounts attributable to stock-based compensation.[8]

AeA, Global, and PwC explained that, from an economic perspective, unrelated parties would not agree to share or reimburse amounts related to stock-based compensation because the value of stock-based compensation is speculative, potentially large, and completely outside the control of the parties. SoFTEC provided a detailed economic analysis from economists William Baumol and Burton Malkiel reaching the same conclusion.

Finally, the Baumol and Malkiel analysis concluded that there is no net economic cost to a corporation or its shareholders from the issuance of stock-based compensation. Similarly, Mr. Grundfest asserted that a company's "decision to grant options to employees * * * does not change its operating expenses" and does not factor into its pricing decisions.

## C. *Final Rule*

### 1. *Regulatory Provisions*

In August 2003 Treasury issued the final rule. The final rule explicitly required parties to QCSAs to share stock-based compensation costs. *See* sec. 1.482–7(d)(2), Income Tax Regs. The final rule also added sections 1.482–1(b)(2)(i) through 1.482–7(a)(3), Income Tax Regs., to provide that a QCSA produces an arm's-length result only if the parties' costs are determined in accordance with the final rule. *See* T.D. 9088, 2003–2 C.B. 841, 847–848.

The final rule provides two methods for measuring the value of stock-based compensation: a default method and an elective method. Under the default method, "the costs attributable to stock-based compensation generally are included as intangible development costs upon the exercise of the option and measured by the spread between the option strike price

---

[8] Federal acquisition regulations prohibit contractors from charging the Government for stock-based compensation. *See* 48 C.F.R. sec. 31.205–6(i) (2013).

and the price of the underlying stock." *Id.*, 2003–2 C.B. at 844. Under the elective method, "the costs attributable to stock options are taken into account in certain cases in accordance with the 'fair value' of the option, as reported for financial accounting purposes either as a charge against income or in footnoted disclosures." *Id.* The elective method, however, is available only with respect to options on stock that is publicly traded "on an established United States securities market and is issued by a company whose financial statements are prepared in accordance with United States generally accepted accounting principles for the taxable year." Sec. 1.482–7(d)(3)(iii)(B)(2), Income Tax Regs.

### 2. *Lack of Evidence From Uncontrolled Transactions*

When it issued the final rule, the files maintained by Treasury relating to the final rule did not contain any expert opinions, empirical data, or published or unpublished articles, papers, surveys, or reports supporting a determination that the amounts attributable to stock-based compensation must be included in the cost pool of QCSAs to achieve an arm's-length result. Those files also did not contain any record that Treasury searched any database that could have contained agreements between unrelated parties relating to joint undertakings or the provision of services. Additionally, Treasury was unaware of any written contract between unrelated parties, whether in a cost-sharing arrangement or otherwise, that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation; or any evidence of any actual transaction between unrelated parties, whether in a cost-sharing arrangement or otherwise, in which one party paid or reimbursed the other party for amounts attributable to stock-based compensation.

### 3. *Response to Comments*

The preamble to the final rule responded to comments that asserted that the proposed amendments to the 1995 cost-sharing regulations were inconsistent with the arm's-length standard, in relevant part, as follows:

> Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard (and therefore with the obligations of the United

States under its income tax treaties and with the OECD transfer pricing guidelines). The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each." *See* H.R. Conf. Rep[t]. No. 99–481 [Vol. II], at II–638 (1986). * * * In order for the costs incurred by a participant to reasonably reflect its actual economic activity, the costs must be determined on a comprehensive basis. Therefore, in order for a QCSA to reach an arm's length result consistent with legislative intent, the QCSA must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the QCSA. Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.

Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances. Section 1.482–1(b)(1)[, Income Tax Regs.,] provides that a "controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that *would have been realized* if uncontrolled taxpayers *had engaged* in the same transaction under the same circumstances." * * * While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available. As recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles. H.R. Rep[t]. No. 99–426, at 423-[4]25 (1985). The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA. Government contractors that are entitled to reimbursement for services on a cost-plus basis under government procurement law assume substantially less entrepreneurial risk than that assumed by service providers that participate in QCSAs, and therefore the economic relationship between the parties to such an arrangement is very different from the economic relationship between participants in a QCSA. The other agreements highlighted by commentators establish arrangements that differ significantly from QCSAs in that they provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement. Such terms, which may have the effect of mitigating the impact of using

a cost base to be shared or reimbursed that is less than comprehensive, would not be permitted by the QCSA regulations. * * *

The regulations relating to QCSAs have as their focus reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles. These final regulations reflect that at arm's length the parties to an arrangement that is based on the sharing of costs to develop intangibles in order to obtain the benefit of an independent right to exploit such intangibles would ensure through bargaining that the arrangement reflected all relevant costs, including all costs of compensating employees for providing services related to the arrangement. Parties dealing at arm's length in such an arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation.

For example, assume that two parties are negotiating an arrangement similar to a QCSA in order to attempt to develop patentable pharmaceutical products, and that they anticipate that they will benefit equally from their exploitation of such patents in their respective geographic markets. Assume further that one party is considering the commitment of several employees to perform research with respect to the arrangement. That party would not agree to commit employees to an arrangement that is based on the sharing of costs in order to obtain the benefit of independent exploitation rights unless the other party agrees to reimburse its share of the compensation costs of the employees. Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

[T.D. 9088, 2003–2 C.B. at 842–843.]

The preamble to the final rule responded to comments that asserted that stock-based compensation does not constitute an economic cost, or relevant economic cost, as follows:

Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account in the context of QCSAs is appropriate. The final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard. Treasury and the IRS agree that the disposition of financial reporting issues does not mandate a particular result under these regulations. [*Id.*, 2003–2 C.B. at 843.]

The preamble to the final rule responded to comments that asserted that parties at arm's length would not share either the exercise spread or grant date value of stock-based compensation because they would produce results that are too speculative or not sufficiently related to the employee services that are compensated, as follows:

Treasury and the IRS believe that it is appropriate for regulations to prescribe guidance in this context that is consistent with the arm's length standard and that also is objective and administrable. As long as the measurement method is determined at or before grant date, either of the prescribed measurement methods can be expected to result in an appropriate allocation of costs among QCSA participants and therefore would be consistent with the arm's length standard. [*Id.*, 2003–2 C.B. at 844.]

Finally, the preamble to the final rule states that "[i]t has also been determined that [APA] section 553(b) * * * does not apply to these regulations." *Id.*, 2003–2 C.B. at 847.

## *Discussion*

### I. *Summary Judgment*

Rule 121(a) provides that either party may move for summary judgment upon all or any part of the legal issues in controversy. Full or partial summary judgment may be granted only if it is demonstrated that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. *See* Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). We conclude that there is no genuine dispute as to any material fact relating to the issue presented by the parties' cross-motions for partial summary judgment and that the issue may be decided as a matter of law.

### II. *Applicable Principles of Administrative Law*

#### A. *Notice and Comment Rulemaking*

Pursuant to APA sec. 553, in promulgating regulations through informal rulemaking an agency must (1) publish a notice of proposed rulemaking in the Federal Register,[9] *see* APA sec. 553(b); (2) provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation", *id.* subsec. (c); and (3) "[a]fter

---

[9] The notice of proposed rulemaking must include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." APA sec. 553(b).

consideration of the relevant matter presented, * * * incorporate in the rules adopted a concise general statement of their basis and purpose", *id.* These requirements do not apply to interpretive rules, [10] *see id.* subsec. (b)(A), or when an agency for good cause finds—and incorporates its findings in the rules issued—that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest", *id.* para. (B).

Generally, interpretive rules merely explain preexisting substantive law. *See Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). Substantive (or legislative) rules by contrast, "create rights, impose obligations, or effect a change in existing law". *Id.* Stated simply, "legislative rules, unlike interpretive rules, have the 'force of law.'" *Id.* (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 301–302 (1979).

A rule has the force of law "only if Congress has delegated legislative power to the agency and if the agency intended to exercise that power in promulgating the rule." *Am. Mining Cong.*, 995 F.2d at 1109 (citing *Am. Postal Workers Union v. USPS*, 707 F.2d 548, 558 (D.C. Cir. 1983)). The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in these cases appears to lie absent a stipulation to the contrary, *see* sec. 7482(b)(1)(B), (2), has held that we can infer that an agency intends for a rule to have the force of law in any of the following circumstances: "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule," *Hemp Indus.*, 333

---

[10] We have previously referred to regulations issued pursuant to specific grants of rulemaking authority as legislative regulations and regulations issued pursuant to Treasury's general rulemaking authority, under sec. 7805(a), as interpretive regulations. *See, e.g.*, *Tutor-Saliba Corp. v. Commissioner*, 115 T.C. 1, 7 (2000). Because the terms "legislative" and "interpretive" have different meanings in the administrative law context, *see Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003), we will refer to regulations issued pursuant to specific grants of rulemaking authority as specific authority regulations and regulations issued pursuant to Treasury's general rulemaking authority, under sec. 7805(a), as general authority regulations.

F.3d at 1087 (citing *Am. Mining Cong.*, 995 F.2d 1106), or "effect[s] a change in existing law or policy", *D.H. Blattner & Sons, Inc. v. Sec'y of Labor, Mine Safety & Health Admin.*, 152 F.3d 1102, 1109 (9th Cir. 1998) (alteration in original) (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)). In determining whether a rule is interpretive or legislative we "need not accept the agency characterization at face value." *Hemp Indus.*, 333 F.3d at 1087 (citing *Gunderson v. Hood*, 268 F.3d 1149, 1154 n.27 (9th Cir. 2001)).

The notice and comment requirements of APA sec. 553 "are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977). Accordingly, "there must be an exchange of views, information, and criticism between interested persons and the agency." *Id.* Additionally, because "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public", an agency is required to respond to significant comments. [11] *Id.* at 35–36. However, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Covad Commc'ns v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006)).

B. *Judicial Review of Agency Decisionmaking—State Farm Review*

Pursuant to APA sec. 706(2)(A), a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". A court's review under this "standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*

---

[11] "[O]nly comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency. Moreover, comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *see also Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (citing *Home Box Office*, 567 F.2d at 35 & n.58).

*Co.*, 463 U.S. 29, 43 (1983); *see also Judulang v. Holder*, 565 U.S. \_\_\_\_, \_\_\_\_, 132 S. Ct. 476, 483 (2011); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). However, a reviewing court must ensure that the agency "engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at \_\_\_\_, 132 S. Ct. at 484. To engage in reasoned decisionmaking, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

In reviewing an agency action a court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)); *see also Judulang*, 565 U.S. at \_\_\_\_, 132 S. Ct. at 484. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

In providing a reasoned explanation for agency action that departs from an agency's prior position the agency must "display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). However, the agency need not demonstrate "that the reasons for the new policy are better than the reasons for the old one". *Id.*

In examining an agency's explanation for issuing a rule a reviewing court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also Carpenter Family Invs., LLC v. Commissioner*, 136 T.C. 373, 380, 396 n.30 (2011). Similarly, when an agency "relie[s] on multiple rationales (and has not done so in the alternative), and * * * [a reviewing court] conclude[s] that at least one of the rationales is defi-

cient," *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993), and *Consol. Edison Co. of N.Y. v. FERC*, 823 F.2d 630, 641–642 (D.C. Cir. 1987)), the court cannot sustain the agency action on the basis of the sufficient rationale unless the court is certain that the agency would have taken the same action "even absent the flawed rationale", *id.* However, the reviewing court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp.*, 419 U.S. at 286).

C. *Judicial Review of Agency Statutory Construction— Chevron Review*

A court reviews an agency's authoritative construction of a statute under the two-step test first articulated in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55–58 (2011). In *Mayo Found.*, the Supreme Court clarified that both specific authority regulations and general authority regulations are to be accorded *Chevron* deference. [12] *See id.*

Under *Chevron* step 1, "applying the ordinary tools of statutory construction," *City of Arlington v. FCC*, 569 U.S. ____, ____, 133 S. Ct. 1863, 1868 (2013), a court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–843. Under *Chevron* step 2, a court must defer to the agency's authoritative

---

[12] The Supreme Court explained that "*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57 (2011) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001)). The Supreme Court concluded that when Treasury issues general authority regulations after full notice and comment procedures, these conditions are met and those regulations are therefore entitled to *Chevron* deference. *See id.* at 56–57.

interpretation of an ambiguous statute "unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Mayo Found.*, 562 U.S. at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)); *see also Judulang*, 565 U.S. at ____, 132 S. Ct. at 483 n.7.

*Chevron* deference applies even where an agency adopts a construction that conflicts with a prior judicial construction of the statute. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–983 (2005). However, if a precedential case holds that a statute unambiguously expresses a congressional intent that is contrary to the agency's construction of the statute, the prior judicial construction controls. *See id.*; *see also United States v. Home Concrete & Supply, LLC*, 566 U.S. ____, ____, 132 S. Ct. 1836, 1844 (2012).

### D. *Harmless Error*

APA sec. 706 instructs reviewing courts to take "due account * * * of the rule of prejudicial error." *See also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659–660 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule[.]" (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004))). This rule reflects the notion that "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate" the agency action. *PDK Labs.*, 362 F.3d at 799.

### III. *Preliminary Administrative Law Issues*

The parties disagree whether the final rule is a legislative rule or an interpretive rule. The parties also disagree regarding the standard of review that we should apply. We therefore address these issues before considering the validity of the final rule.

### A. *APA Sec. 553 Applies to the Final Rule*.

Petitioner contends that the final rule is a legislative rule under APA sec. 553(b) and is therefore subject to the notice and comment requirements of APA sec. 553 because, if valid, it would have the force of law. Alternatively, petitioner contends that if the final rule were an interpretive rule, it would "not have the force and effect of law", *Shalala v. Guernsey*

*Mem'l Hosp.*, 514 U.S. 87, 99 (1995), and therefore the final rule would not be binding on this Court. Respondent agrees that the final rule has the force of law but disagrees with petitioner's contention that it is a legislative rule. However, respondent declined to argue this issue on brief or at oral argument.

Instead, respondent contends that we need not decide this issue because Treasury complied with the notice and comment requirements. However, petitioner contends that Treasury failed to adequately explain the basis of the final rule, and Treasury's obligation to explain the basis of the final rule depends, at least in part, on its being a legislative rule subject to the notice and comment requirements of APA sec. 553. *See* APA sec. 553(c); *cf.* Internal Revenue Manual pt. 32.1.5.4.7.5.1(2) (Sept. 30, 2011) ("[M]ost IRS/Treasury regulations will be interpretative regulations because they fill gaps in legislation or have a prior existence in the law."); *id.* pt. 32.1.5.4.7.3(1) ("In the Explanation of Provisions section, the drafting team should describe the substantive provisions of the regulation in clear, concise, plain language * * *. It is not necessary to justify the rules that are being proposed or adopted or alternatives that were considered.").[13] Petitioner also contends that Treasury failed to respond to significant comments, and Treasury's obligation to respond to significant comments is derived, at least in part, from the notice and comment requirements of APA sec. 553. *See Home Box Office*, 567 F.2d at 35–36. Moreover, we cannot avoid this issue because petitioner alternatively contends that the final rule would not bind this Court if it were an interpretive rule. Consequently, we will decide this issue.

Pursuant to section 7805(a) the Secretary is authorized to "prescribe all needful rules and regulations for the enforcement of" the Code. Such regulations carry the force of law, and the Code imposes penalties for failing to follow them. *See, e.g.*, sec. 6662(b)(1). We therefore conclude that "Congress has delegated legislative power to" Treasury. *Am. Mining Cong.*, 995 F.2d at 1109.

We further conclude that Treasury intended for the final rule to have the force of law for the following reasons: (1) the

---

[13] The current version of Internal Revenue Manual pt. 32.1.5.4.7.3(1) (Oct. 20, 2014) omits the second sentence.

parties stipulated—and we agree, *see Xilinx Inc. v. Commissioner*, 125 T.C. 37—that the adjustments to petitioner's income can be sustained only on the basis of the final rule, *see Hemp Indus.*, 333 F.3d at 1087, and (2) in promulgating the final rule Treasury invoked its general legislative rule-making authority under section 7805(a), *see id.* The final rule is therefore a legislative rule. *See Am. Mining Cong.*, 995 F.2d at 1109.

Because it is a legislative rule and Treasury did not find for good cause that notice and comment were impracticable, unnecessary, or contrary to the public interest, *see* APA sec. 553(b)(A) and (B), APA sec. 553 applies to the final rule. We must therefore also consider whether Treasury satisfied its obligations under APA sec. 553(b) and (c) in issuing the final rule.

### B. *The Final Rule Must Satisfy State Farm's Reasoned Decisionmaking Standard.*

Petitioner contends that we should review the final rule under *State Farm*. Respondent contends that we should review the final rule under *Chevron*. For the reasons that follow, we conclude that—regardless of the ultimate standard of review—the final rule must satisfy *State Farm*'s reasoned decisionmaking standard.

Respondent contends that *State Farm* review is not appropriate because the interpretation and implementation of section 482 do not require empirical analysis. Similarly, respondent repeatedly argues that section 482 does not require allocations to be made with reference to uncontrolled party conduct. But "[t]he purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." *Commissioner v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting section 1.482–1(b)(1), Income Tax Regs. (1971)); *accord* sec. 1.482–1(a)(1), (b)(1), Income Tax Regs.; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9; Treasury Department Technical Explanation of the 1997

U.S.-Ir. Income Tax Convention and Protocol, art. 9, Tax Treaties (CCH) para. 4435, at 103,223; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9. For these reasons we have previously stated that "the determination under section 482 is essentially and intensely factual". *Procacci v. Commissioner*, 94 T.C. 397, 412 (1990).

Section 1.482–1(b)(1), Income Tax Regs., provides that "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." In *Xilinx Inc. v. Commissioner*, 125 T.C. at 53–55, we held that the arm's-length standard always requires an analysis of what unrelated entities do under comparable circumstances. Similarly, in promulgating the final rule Treasury explicitly considered whether unrelated parties would share stock-based compensation costs in the context of a QCSA. *See* T.D. 9088, 2003–2 C.B. at 843 ("Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation."). Treasury necessarily decided an empirical question when it concluded that the final rule was consistent with the arm's-length standard.

Respondent counters that Treasury should be permitted to issue regulations modifying—or even abandoning—the arm's-length standard. But the preamble to the final rule does not justify the final rule on the basis of any modification or abandonment of the arm's-length standard,[14] and respondent concedes that the purpose of section 482 is to achieve tax parity.[15] The preamble also did not dismiss any of the evi-

---

[14] For example, the preamble does not say that controlled transactions can never be comparable to uncontrolled transactions because related and unrelated parties always occupy materially different circumstances. *Cf. Xilinx Inc. v. Commissioner*, 598 F.3d at 1197 (Fisher, J., concurring) ("The Commissioner * * * contends that analyzing comparable transactions is unhelpful in situations where related and unrelated parties always occupy materially different circumstances.").

[15] The preamble states that "Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard

dence submitted by commentators regarding unrelated party conduct as addressing an irrelevant or inconsequential factor. *See id.*, 2003–2 C.B. at 842–843. We therefore need not decide whether, under *Brand X*, 545 U.S. at 982–983, Treasury would be free to modify or abandon the arm's-length standard because it has not done so here. *See Chenery Corp.*, 332 U.S. at 196; *Carpenter Family Invs., LLC v. Commissioner*, 136 T.C. at 380, 396 n.30.

The validity of the final rule therefore turns on whether Treasury reasonably concluded, *see State Farm*, 463 U.S. at 43, that it is consistent with the arm's-length standard, and that is necessarily an empirical determination. The reasonableness of Treasury's conclusion in no way depends on its interpretation of section 482 or any other statute. As the Supreme Court recently articulated, *State Farm* review is "the more apt analytic framework" where the challenged regulation does not rely on an agency's interpretation of a statute. *Judulang*, 565 U.S. at \_\_\_ n.7, 132 S. Ct. at 483.

Nevertheless, respondent contends that we should not review the final rule under *State Farm* because the Supreme Court has never, and this Court has rarely, reviewed Treasury regulations under *State Farm*. However, respondent concedes that Treasury is subject to the APA, and respondent has not advanced any justification for exempting Treasury regulations from *State Farm* review. The Supreme Court has stated that "[i]n the absence of such justification, we are not inclined to carve out an approach to administrative review good for tax law only. To the contrary, we have expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" *Mayo Found.*, 562 U.S. at 55 (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999) (alteration in original)); *see also Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1319 (Fed. Cir. 2012) (invalidating the associated-property rule in section 1.263A–11(e)(1)(ii)(B), Income Tax Regs., under *State Farm*).

---

in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances." T.D. 9088, 2003–2 C.B. 841, 842. However, the preamble never suggests that the final rule could be consistent with the arm's-length standard if evidence showed that unrelated parties would not share stock-based compensation costs or that an evidentiary inquiry was unnecessary. *See id.*, 2003–2 C.B. at 842–843.

Ultimately, however, whether *State Farm* or *Chevron* supplies the standard of review is immaterial because *Chevron* step 2[16] incorporates the reasoned decisionmaking standard of *State Farm*. *See Judulang*, 565 U.S. at ____ n.7, 132 S. Ct. at 483 (stating that, under either standard, the "analysis would be the same, because under *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance'" (quoting *Mayo Found.*, 562 U.S. at 53)); *Torres-Valdivias v. Holder*, 766 F.3d 1106, 1114 n.5 (9th Cir. 2014) (citing *Judulang*, 565 U.S. at ____ n.7, 132 S. Ct. at 483); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (citing *Judulang*, 565 U.S. at ____ n.7, 132 S. Ct. at 483). Because the validity of the final rule turns on whether Treasury reasonably concluded that it is consistent with the arm's-length standard, the final rule must—in any event—satisfy *State Farm*'s reasoned decisionmaking standard. Accordingly, we will examine whether the final rule satisfies that standard without deciding whether *Chevron* or *State Farm* provides the ultimate standard of review.

## IV. *Whether the Final Rule Satisfies State Farm's Reasoned Decisionmaking Standard*

Petitioner contends that the final rule is invalid because (A) it lacks a basis in fact, (B) Treasury failed to rationally connect the choice it made with the facts it found, (C) Treasury failed to respond to significant comments, and (D) the final rule is contrary to the evidence before Treasury. Respondent disagrees.

### A. *The Final Rule Lacks a Basis in Fact*.

Petitioner contends that the final rule lacks a basis in fact because Treasury issued the final rule without any evidence that unrelated parties would ever agree to share stock-based compensation costs. Respondent contends that (1) Treasury did not rely solely on its belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs but also on the commensurate-with-income standard and (2) Treasury was sufficiently experienced with cost-sharing agreements to conclude that unrelated parties

---

[16] The parties agree that sec. 482 is ambiguous. These cases would therefore be resolved at *Chevron* step 2.

entering into QCSAs would generally share stock-based compensation costs.

1. *The Commensurate-With-Income Standard Cannot Justify the Final Rule*.

Although Treasury referred to the commensurate-with-income standard in the preamble to the final rule, it relied on its belief that the final rule was required by—or was at least consistent with—the arm's-length standard.[17] In *Xilinx Inc. v. Commissioner*, 125 T.C. at 56–58, we concluded that Congress never intended for the commensurate-with-income standard to supplant the arm's-length standard. In the 1988 White Paper, Treasury and the IRS similarly concluded that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard. *See* Notice 88–123, 1988–2 C.B. 458, 472, 475. Treasury has since repeatedly reinforced this conclusion in technical explanations to numerous income tax treaties.[18] *See, e.g.*, Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306–201,307; Treasury Department Technical Explanation of the 1997 U.S.-Ir. Income Tax Convention and Protocol, Tax Treaties (CCH) para. 4435, at 103,223; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties

[17] In its response to comments asserting that stock-based compensation does not constitute an economic cost to the issuing corporation, Treasury appears to have relied *exclusively* on the arm's-length standard. *See* T.D. 9088, 2003–2 C.B. at 843 ("Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account in the context of QCSAs is appropriate. The final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard.").

[18] "A tax treaty is negotiated by the United States with the active participation of the Treasury. The Treasury's reading of the treaty is 'entitled to great weight.'" *Xilinx Inc. v. Commissioner*, 598 F.3d at 1196–1197 (Noonan, J.) (quoting *United States v. Stuart*, 489 U.S. 353, 369 (1989)), *aff'g* 125 T.C. 37 (2005). Therefore, "[e]ven if the treaty and the Technical Explanation should be held not to operate as law trumping the hapless * * * [final rule], treaty and explanation act as guides. They tell us what the Treasury * * * had in mind", *Xilinx Inc. v. Commissioner*, 567 F.3d 482, 500–501 (9th Cir. 2009) (Noonan, J., dissenting), *rev'g and remanding* 125 T.C. 37, *withdrawn*, 592 F.3d 1017 (9th Cir. 2010), in issuing the final rule.

(CCH) para. 215, at 10,640–10,641. The preamble to the final rule does not indicate that Treasury intended to abandon this conclusion and we conclude that it did not. [19]

Moreover, because Treasury did not rely *exclusively* on the commensurate-with-income standard, we cannot sustain the final rule solely on that basis if we decide that Treasury's reliance on the arm's-length standard in issuing the final rule was unreasonable. *See Chenery Corp.*, 332 U.S. at 196; *Nat'l Fuel Gas Supply*, 468 F.3d at 839 (citing *Allied-Signal*, 988 F.2d at 150–151, and *Consol. Edison*, 823 F.2d at 641–642). Accordingly, the commensurate-with-income standard, as interpreted by Treasury, cannot provide a sufficient basis for the final rule.

### 2. *Treasury's Unsupported Assertion Cannot Justify the Final Rule*.

A court will generally not override an agency's "reasoned judgment about what conclusions to draw from technical evidence or how to adjudicate between rival scientific [or economic] theories". *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437 F.3d 75, 83 (D.C. Cir. 2006). However, "where an agency has articulated no reasoned basis for its decision—where its action is founded on unsupported assertions or unstated inferences—* * * [a court] will not 'abdicate the judicial duty carefully to "review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence."'" *Id.* (quoting *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187 (D.C. Cir. 1990)).

Respondent concedes that (1) in adopting the final rule, Treasury took the position that it was not obligated to engage in fact finding or to follow evidence gathering procedures; (2) the files maintained by Treasury relating to the final rule did not contain any empirical or other evidence supporting Treasury's belief that unrelated parties entering into QCSAs would generally share stock-based compensation

---

[19] Even were we to conclude that Treasury intended to adopt a more expansive understanding of the commensurate-with-income standard, we would be unable to sustain the final rule on that basis because Treasury never acknowledged that it was changing its position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

costs; (3) the files maintained by Treasury relating to the final rule did not have any record that Treasury searched any database that could have contained agreements between unrelated parties; and (4) Treasury was unaware of any written agreement—or of any transaction—between unrelated parties that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation.[20]

The preamble to the final rule offered only Treasury's belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs. Specifically, the preamble to the final rule states that, in the context of a hypothetical QCSA between unrelated parties to develop patentable pharmaceutical products, "Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation." T.D. 9088, 2003–2 C.B. at 843. Treasury, however, failed to provide a reasoned basis for reaching this conclusion from any evidence in the administrative record. *See Tripoli Rocketry*, 437 F.3d at 83. Indeed, "every indication in the record points the other way". *State Farm*, 463 U.S. at 57 (internal quotation omitted); *see infra* part IV.C.

Respondent defends Treasury's failure to provide a reasoned basis for its conclusion from any evidence in the administrative record on the notion that "[t]here are some propositions for which scant empirical evidence can be marshaled". *See Fox Television*, 556 U.S. at 519. This may be true regarding certain propositions, *see id.* ("the harmful effect of broadcast profanity on children is one of them"), but we do not agree that the belief that unrelated parties would share stock-based compensation costs in the context of a QCSA is one of them. First, commentators submitted significant evidence regarding this proposition. *See infra* part IV.C.

---

[20] Treasury's failure to conduct any factfinding before issuing the final rule is also evident in the preamble to the final rule. *See* T.D. 9088, 2003–2 C.B. at 842 ("While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs *such data may not be available*." (Emphasis added.)).

Second, we were able to reach a definitive factual determination on the basis of significant evidence regarding this very proposition in *Xilinx*. *See Xilinx Inc. v. Commissioner*, 125 T.C. at 58–62. Third, Treasury could not have rationally concluded that this is a proposition "for which scant empirical evidence can be marshaled", *see Fox Television*, 556 U.S. at 519, without attempting to marshal empirical evidence in the first instance, which respondent concedes it did not do.

Relying on *Peck v. Thomas*, 697 F.3d 767 (9th Cir. 2012), respondent further contends that we must defer to Treasury's expertise with respect to whether the parties operating at arm's length would share stock-based compensation. At issue in *Peck* was a regulation issued by the Bureau of Prisons that denied early release to inmates with a felony conviction for certain enumerated offenses. In issuing the regulation the Bureau of Prisons expressly relied on its "'correctional experience'" in determining which offenses warrant preclusion from early release but did not disclose any statistical studies to support its conclusions. *See id.* at 773 (quoting 74 Fed. Reg. 1895 (Jan. 14, 2009)). The U.S. Court of Appeals for the Ninth Circuit rejected an inmate's argument that the Bureau of Prisons violated the APA in issuing this regulation because it did not develop statistical evidence to support its conclusions. *See id.* at 775–776. The Court of Appeals reasoned that the Bureau of Prisons was entitled to rely on its experience and the APA did not require it to develop statistical evidence to support its conclusions. *See id.* (citing *Sacora v. Thomas*, 628 F.3d 1059, 1067, 1069 (9th Cir. 2010)).

Respondent's reliance on *Peck* is misplaced. First, in *Peck*, the Bureau of Prisons relied on its extensive correctional experience in determining which offenses warrant preclusion from early release. Here, by contrast, Treasury admits that it had no knowledge of any transactions in which parties operating at arm's length shared stock-based compensation.

Second, the preamble to the regulation at issue in *Peck* expressly relied on the Bureau of Prisons' extensive, hands-on correctional experience. Here, by contrast, the preamble to the final rule does not rely on Treasury's experience as a party to arm's-length cost-sharing agreements—or even on any experience Treasury may have had in examining the arm's-length cost-sharing agreements of taxpayers it regu-

lates. Indeed, the preamble to the final rule all but disclaimed Treasury's reliance on any such experience.

Third, the administrative record for the regulation at issue in *Peck* contained no evidence contradicting the Bureau of Prisons' correctional experience. Here, by contrast, commentators introduced significant evidence showing that parties operating at arm's length would not share stock-based compensation. *See infra* part IV.C. *Peck* does not support the contention that an agency can rely on unsupported assertions in the face of significant contrary evidence in the administrative record.

We conclude that (1) by failing to engage in any fact finding, Treasury failed to "examine the relevant data", *State Farm*, 463 U.S. at 43, and (2) Treasury failed to support its belief that unrelated parties would share stock-based compensation costs in the context of a QCSA with any evidence in the record. Accordingly, the final rule lacks a basis in fact.

### B. *Treasury Failed To Rationally Connect the Choice It Made With the Facts It Found*.

Petitioner contends that the preamble to the final rule fails to rationally connect the choice that Treasury made in issuing a uniform final rule with the facts on which it purported to rely. *See id.* The preamble to the final rule indicates that Treasury relied on its belief that unrelated parties entering into QCSAs to develop "high-profit intangibles" would share stock-based compensation if the stock-based compensation was a "significant element" of the compensation. T.D. 9088, 2003–2 C.B. at 842–843. However, petitioner alleges, and respondent does not dispute, that (1) many QCSAs do not deal with "high-profit intangibles" and (2) stock-based compensation is often not a "significant element" of the compensation of the employees of taxpayers that enter into QCSAs. Yet the final rule does not distinguish between QCSAs to develop "high-profit intangibles" in which stock-based compensation was a "significant element" of the compensation and QCSAs in which these elements are not present. Petitioner contends—and we agree—that the preamble's explanation for Treasury's decision is therefore inadequate. *See State Farm*, 463 U.S. at 43.

Indeed, respondent does not directly refute petitioner's contention. Instead, respondent defends the final rule's

inflexibility by arguing that the final rule is reasonable because it eases administrative burdens.[21]

Improving administrability can be a reasonable basis for agency action. *See Mayo Found.*, 562 U.S. at 59 ("[Treasury] reasonably concluded that its full-time employee rule would 'improve administrability[.]'" (quoting T.D. 9167, 2005–1 C.B. 261, 262)). However, Treasury failed to give this—or any other—explanation for treating all QCSAs identically in the preamble to the final rule,[22] *cf. id.*, and we cannot reasonably discern, *see State Farm*, 463 U.S. at 43, that this was Treasury's rationale for adopting a uniform final rule because the administrative benefits of a uniform final rule are entirely speculative.[23]

Moreover, even if we could discern that this was Treasury's intent, we would be unable to sustain the final rule on that basis because Treasury did not disclose its factual findings and we would therefore be unable to evaluate whether Treasury reasonably concluded that the purported administrative benefits of a uniform final rule can justify erroneously allocating income in some of those cases. We therefore conclude that, by treating all QCSAs identically, Treasury failed to articulate a "rational connection between the facts found

[21] Respondent also argues that petitioner cannot complain if the final rule sometimes produces results that are inconsistent with the arm's-length standard because the QCSA regime provides an "elective assured treatment". However, Treasury rejected commentators' suggestion to issue the final rule as a safe harbor, *see* T.D. 9088, 2003–2 C.B. at 843–844, and we conclude that petitioner has not forfeited its right to challenge the validity of the final rule because it chose to structure the R&D cost-sharing agreement as a QCSA.

[22] The preamble to the final rule discusses administrability only with respect to Treasury's selection of the exercise spread method and the elective grant date method as the only available valuation methods. *See* T.D. 9088, 2003–2 C.B. at 844.

[23] We also note that unlike the statutory provision at issue in *Mayo Found.*, sec. 482 purports only to empower the Secretary to allocate income among controlled entities but not to directly govern taxpayer conduct. *See* sec. 1.482–1(a)(3), Income Tax Regs. ("If necessary to reflect an arm's length result, a controlled taxpayer *may* report * * * the results of its controlled transactions based upon prices different from those actually charged." (Emphasis added.)). It is accordingly unclear whether administrability concerns are relevant in the context of sec. 482. However, because we cannot reasonably discern that Treasury relied on administrability concerns here, we need not resolve this question.

and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

C. *Treasury Failed To Respond to Significant Comments*.

Petitioner contends that Treasury failed to respond to significant comments submitted by commentators. Respondent contends that Treasury was not persuaded by the submitted comments.

Several commentators informed Treasury that they knew of no evidence of any transaction between unrelated parties that required one party to reimburse the other party for amounts attributable to stock-based compensation. Additionally, AeA informed Treasury that a survey of its member companies' arm's-length codevelopment and joint venture agreements found none in which the parties agreed to share stock-based compensation costs. We found similar evidence to be relevant in *Xilinx*. *See Xilinx Inc. v. Commissioner*, 125 T.C. at 59. Treasury never directly responded to this evidence. Instead, Treasury reasoned that the final rule would not be inconsistent with the arm's-length standard in the absence of evidence that unrelated parties share stock-based compensation costs because relevant data may not be available. *See* T.D. 9088, 2003–2 C.B. at 842. Treasury's response, however, in no way refutes the commentators' evidence that unrelated parties never share such compensation.

AeA and PwC further represented to Treasury that they conducted multiple searches of the EDGAR system and found no cost-sharing agreements between unrelated parties in which the parties agreed to share either the exercise spread or grant date value of stock-based compensation. Treasury never responded to this evidence.

Several commentators identified arm's-length agreements in which stock-based compensation was not shared or reimbursed. Treasury responded to these comments by stating that "[t]he uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." *Id.* In particular, Treasury stated that

[t]he other agreements highlighted by commentators establish arrangements that differ significantly from QCSAs in that they provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement. Such terms, which may have the effect of mitigating the impact of using a cost base to be shared or reimbursed that is less than comprehensive, would not be permitted by the QCSA regulations. * * * [*Id.*]

However, the Amylin-HMR collaboration agreement that AeA identified and PwC submitted did not "provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement." *Id.* Respondent contends that the Amylin-HMR collaboration agreement is not comparable to a QCSA for other reasons, but Treasury failed to identify those reasons in the preamble to the final rule.[24] *See Chenery Corp.*, 332 U.S. at 196; *Carpenter Family Invs., LLC v. Commissioner*, 136 T.C. at 380, 396 n.30. More significantly, Treasury did not explain why identical transactions are necessary to prove whether unrelated parties would share stock-based compensation costs in the context of a QCSA. In *Xilinx Inc. v. Commissioner*, 125 T.C. at 58–62, we found that unrelated parties would not share the exercise spread or grant date value of stock-based compensation, and in doing so we did not rely on transactions that were identical or substantially similar to QCSAs. Rather, we relied on the behavior of uncontrolled parties in comparable business transactions as well as on other evidence. *See id.*[25]

FEI provided model accounting procedures from COPAS that recommended against sharing stock-based compensation because it is difficult to value. Treasury never responded to this evidence.

---

[24] The Amylin-HMR collaboration agreement also would permit the sharing of stock-based compensation based on the intrinsic value method, under which options issued in-the-money would be recognized as an expense. However, the treatment of in-the-money stock options is not at issue here, and the final rule explicitly rejected the use of the intrinsic value method. *See* T.D. 9088, 2003–2 C.B. at 844.

[25] Treasury appears to require a similar approach in analyzing comparability under the sec. 482 regulations. *See* sec. 1.482–1(d), Income Tax Regs.

AeA, SoFTEC, KPMG, and PwC cited regulations that prohibit contractors from charging the Federal Government for stock-based compensation. Treasury responded to this evidence by stating that "[g]overnment contractors that are entitled to reimbursement for services on a cost-plus basis under government procurement law assume substantially less entrepreneurial risk than that assumed by service providers that participate in QCSAs". *See* T.D. 9088, 2003–2 C.B. at 842. However, this distinction rings hollow in the face of other evidence submitted by commentators that showed that even parties to agreements in which the parties assume considerable entrepreneurial risk do not share stock-based compensation costs.

AeA, Global, and PwC explained that, from an economic perspective, unrelated parties would be unwilling to share stock-based compensation costs because the value of stock-based compensation is speculative, potentially large, and completely outside the control of the parties. SoFTEC submitted Baumol and Malkiel's detailed economic analysis reaching the same conclusion. We found similar evidence to be relevant in *Xilinx*. *See Xilinx Inc. v. Commissioner*, 125 T.C. at 61. Treasury never directly responded to this evidence. Instead, Treasury construed these comments as objections to Treasury's selection of the exercise spread method and the grant date method as the only available valuation methods. *See* T.D. 9088, 2003–2 C.B. at 844. Treasury responded that these methods are consistent with the arm's-length standard and are administrable. *See id.* Treasury, however, never explained how these methods could be consistent with the arm's-length standard if unrelated parties would not share them or why unrelated parties would share stock-based compensation costs in any other way.

The Baumol and Malkiel analysis also concluded that there is no net economic cost to a corporation or its shareholders from the issuance of stock-based compensation. Treasury identified this evidence in the preamble to the final rule but did not directly respond to it. *See id.*, 2003–2 C.B. at 843. Instead, the preamble states that "[t]he final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard." *Id.* Treasury, however, never explained why unrelated parties would share

stock-based compensation costs—or how the commensurate-with-income standard could justify the final rule—if stock-based compensation is not an economic cost to the issuing corporation or its shareholders. [26]

Mr. Grundfest informed Treasury that companies do not factor stock-based compensation into their pricing decisions. We found similar evidence to be relevant in *Xilinx*. *See Xilinx Inc. v. Commissioner*, 125 T.C. at 59. Treasury never responded to this evidence.

Indeed, Treasury failed to respond directly to any of the evidence that unrelated parties would not share stock-based compensation costs, other than by asserting that the transactions cited by the commentators did not "share enough characteristics of QCSAs involving the development of high-profit intangibles" to be relevant. T.D. 9088, 2003–2 C.B. at 842. This was a mere assertion; Treasury offered no analysis addressing the extent of the supposed differences or explaining why any differences make the cited transactions irrelevant or unpersuasive. By contrast, in *Xilinx* we examined a broad array of evidence to determine whether unrelated parties would share such costs. *See Xilinx Inc. v. Commissioner*, 125 T.C. at 58–62. Tellingly, respondent does not even attempt to explain why Treasury failed to address similar evidence in the preamble to the final rule.

Although Treasury's failure to respond to an isolated comment or two would probably not be fatal to the final rule, Treasury's failure to meaningfully respond to numerous relevant and significant comments certainly is. *See Home Box Office*, 567 F.2d at 35–36. Meaningful judicial review and fair treatment of affected persons require "an exchange of views, information, and criticism between interested persons and the agency." *Id.* at 35. Treasury's failure to adequately respond to commentators frustrates our review of the final rule and was prejudicial to affected entities.

---

[26] Respondent contends that the final rule is consistent with the commensurate-with-income standard because stock-based compensation is economic activity even if it is not an economic cost. However, Treasury never made this distinction in the preamble to the final rule, *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Carpenter Family Invs., LLC v. Commissioner*, 136 T.C. 373, 380, 396 n.30 (2011), and it did not explain why unrelated parties would share items that are not economic costs.

### D. *The Final Rule Is Contrary to the Evidence Before Treasury*.

Petitioner contends that the final rule is contrary to the evidence before Treasury when it issued the final rule. We agree.

We have already discussed Treasury's failure to cite any evidence supporting its belief that unrelated parties to QCSAs would share stock-based compensation costs, *see supra* part IV.A; the significant evidence submitted by commentators showing that unrelated parties to QCSAs would not share stock-based compensation costs, *see supra* part IV.C; and Treasury's failure to respond to much of the submitted evidence, *see id.*

Significantly, Treasury never said that it found any of the submitted evidence incredible. Treasury also seemed to accept the commentators' economic analyses, which concluded that—and explained why—unrelated parties to a QCSA would be unwilling to share the exercise spread or grant date value of stock-based compensation. Finally, respondent has not identified any evidence in the administrative record that supports Treasury's belief that unrelated parties to QCSAs would generally share stock-based compensation costs.

Although we are mindful that "a court is not to substitute its judgment for that of the agency", *State Farm*, 463 U.S. at 43, we conclude that Treasury's "explanation for its decision * * * runs counter to the evidence before" it, *see id.*

## V. *Harmless Error*

Respondent contends that, pursuant to the harmless error rule of APA sec. 706, any deficiencies in Treasury's reasoning should not invalidate the final rule because (1) Treasury had sufficient alternative reasons for adopting the final rule and (2) in the years following Treasury's adoption of the final rule the Financial Accounting Standards Board (FASB), the International Accounting Standards Board (IASB), and the Organisation for Economic Cooperation and Development

(OECD)[27] have adopted policy positions that concur with Treasury's.[28]

A. *Alternative Reasons for Adopting the Final Rule*

Although the preamble refers to the commensurate-with-income standard, we have already concluded that Treasury never indicated that it was prepared to independently rely on the commensurate-with-income standard—or any other reason—as a basis for adopting the final rule. *See supra* parts III.B and IV.A.1. Moreover, because the arm's-length standard is incorporated into numerous income tax treaties, *see, e.g.*, 2001 U.S.-U.K. Income Tax Convention, art. 9; 2006 U.S. Model Income Tax Convention, art. 9; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306–201,307; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9; Tax Treaties (CCH) para. 215, at 10,640–10,641, respondent cannot reasonably contend that Treasury would have clearly adopted the final rule had it concluded that the final rule conflicted with that standard. *See PDK Labs.*, 362 F.3d at 799.

---

[27] In 2004 the OECD published a report on the impact of employee stock options on transfer pricing that "start[ed] with the premise that employee stock options are remuneration." OECD, Employee Stock Option Plans: Impact on Transfer Pricing 1. In 2005, however, the OECD published a policy study that again started with the same premise but recognized that the arm's-length standard required more analysis. *See* OECD, The Taxation of Employee Stock Options, Tax Policy Studies No. 11, at 165 ("Of course, whether in-kind remuneration, including stock options, should be taken into account in any particular case depends on a determination of what independent parties acting at arm's length would do in the facts and circumstances of that case.").

[28] Each of the policy positions that respondent now contends support the 2003 final rule was published *after* Treasury promulgated the final rule. *See, e.g.*, Statement of Financial Accounting Standards No. 123, Accounting for Stock-Based Compensation (revised 2004), Share-Based Payment; International Financial Reporting Standard No. 2, Share-based Payment, February 2004; OECD, Employee Stock Option Plans: Impact on Transfer Pricing; *see also* OECD, the Taxation of Employee Stock Options, OECD Tax Policy Studies No. 11.

## B. *Settled Policy*

Respondent's argument that the policy debate underlying the final rule has long been settled is irrelevant and misapprehends the role of this Court under *State Farm*. It is irrelevant because Treasury expressly disavowed reliance on financial reporting standards when it issued the final rule, *see* T.D. 9088, 2003–2 C.B. at 843 ("Treasury and the IRS agree that the disposition of financial reporting issues does not mandate a particular result under these regulations."), and the policy positions to which respondent refers did not exist and were therefore unavailable to Treasury when it issued the final rule, *see Chenery Corp.*, 332 U.S. at 196; *Carpenter Family Invs., LLC v. Commissioner*, 136 T.C. at 380, 396 n.30. Respondent's argument misapprehends the role of this Court because, under *State Farm*, our role is not to decide whether the final rule is good policy—it is simply to "ensur[e] that * * * [Treasury] engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at ____, 132 S. Ct. at 483–484.

Because it is not clear that Treasury would have adopted the final rule had it concluded that the final rule is inconsistent with the arm's-length standard, the harmless error rule is inapplicable.

## VI. *Conclusion*

Because the final rule lacks a basis in fact, Treasury failed to rationally connect the choice it made with the facts found, Treasury failed to respond to significant comments when it issued the final rule, and Treasury's conclusion that the final rule is consistent with the arm's-length standard is contrary to all of the evidence before it, we conclude that the final rule fails to satisfy *State Farm*'s reasoned decisionmaking standard and therefore is invalid.[29] *See* APA sec. 706(2)(A);

---

[29] Because we conclude that the final rule fails to satisfy *State Farm*'s reasoned decisionmaking standard, the final rule would be invalid even if we were to conclude that *Chevron* supplies the ultimate standard of review. *See supra* part III.B. The analysis under *Chevron* would proceed as follows: The parties agree that sec. 482 is ambiguous. We would therefore proceed to *Chevron* step 2. Under *Chevron* step 2, we would conclude the final rule is invalid because it is "arbitrary or capricious in substance", *Judulang v. Holder*, 565 U.S. ____, ____ n.7, 132 S. Ct. 476, 483 (2011) (quoting *Mayo Found.*, 562 U.S. at 53), and therefore cannot be justified

Continued

*State Farm*, 463 U.S. at 43. Indeed, Treasury's *"ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997).

By reason of the above respondent erred in making the section 482 allocations at issue, and petitioner is therefore entitled to partial summary judgment. We will grant petitioner's motion and deny respondent's motion.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

*An appropriate order will be issued*.

Reviewed by the Court.

THORNTON, COLVIN, HALPERN, FOLEY, VASQUEZ, GALE, GOEKE, HOLMES, PARIS, KERRIGAN, BUCH, LAUBER, NEGA, and ASHFORD, *JJ*., agree with this opinion of the Court.

MORRISON and PUGH, *JJ*., did not participate in the consideration of this opinion.

———

as being a reasonable interpretation of what sec. 482 requires.